OSCAR GERMANN, INDIVIDUALLY AND AS ADMINISTRA-
TOR *AD PROSEQUENDUM* AND GENERAL ADMINISTRA-
TOR OF THE ESTATE OF GERDA GERMANN, DE-
CEASED, PLAINTIFF-RESPONDENT, v. JOSEPH P.
MATRISS, DEFENDANT-APPELLANT.

Argued October 21, 1969—Decided January 19, 1970.

Mr. *Wilbur A. Stevens* argued the cause for appellant (*Messrs. Stevens and Mathias,* attorneys).

Mr. *Seymour Cohen* argued the cause for respondent (*Mr. Joseph Coult,* of counsel).

The opinion of the court was delivered by

FRANCIS, J. In this action plaintiff Oscar Germann claimed damages against defendant Dr. Joseph P. Matriss, a practicing dentist of this State, alleging malpractice which caused injury and eventually death of Gerda Germann. Plaintiff, husband of decedent, was appointed general administrator of her estate and sought an award for the pain and suffering decedent endured in the interval between the allegedly negligent treatment and her death. *N. J. S. A.* 2A:15–3. He sued also as administrator *ad prosequendum* to recover for the damages sustained by the next of kin as a result of the death. *N. J. S. A.* 2A:31–1, 2, 4. In a third count he sought recovery in his individual capacity as husband of decedent for the medical and hospital expenses he incurred before her death. Jury trial of the case eventuated in a verdict for the defendant. The Appellate Division reversed and remanded the action for a new trial because of errors it found the trial court had committed. *Germann v. Matriss,* 104 *N. J. Super.* 466 (*App. Div.* 1969). We granted defendant's petition for certification. 54 *N. J.* 169 (1969).

## I

Since January, 1949, Dr. Joseph Matriss has been a practicing dentist and dental surgeon in East Rutherford. On December 15, 1964, Mrs. Germann visited his office to arrange for the extraction of the 11 teeth remaining in the upper part of her mouth. On that day the doctor took an impression of the upper teeth and the roof of her mouth in order to have an acrylic denture ready for insertion in her mouth upon completion of the extractions. It is undisputed that the preparation of such a denture and its immediate insertion in the patient's mouth after the extractions is a well-recognized standard practice in the profession of dental oral surgery. The denture serves a three-fold purpose: (1) functional—to maintain a constant masticatory apparatus for the patient; (2) cosmetic—to maintain the normal facial expression and

the normal relationship of the upper and lower jaws; (3) protective—to supply a bandage or covering for the wounds caused by the removal of the teeth.

After Mrs. Germann's visit of December 15, Dr. Matriss ordered an acrylic denture to be fabricated in his own dental laboratory located in the same building as his office. The denture was fabricated from a mold made from the impression taken on December 15. An acrylic material in dough form was placed in the mold, boiled in water, put into a steam bath and cooked for four hours. On removal from the bath it was polished and cleansed by scouring and scrubbing with an antiseptic soap the elements of which were compatible with the composition of acrylic dentures. Immediately thereafter, it was placed in a plastic, self-sealing bag holding zephiran chloride, a disinfectant also compatible with the composition of acrylic dentures. Then the denture was taken in the sealed bag to the defendant's dental office. It was kept there until shortly before it was to be used, and as the actual time for use neared, it was removed from the plastic bag and immediately placed in a covered stainless steel tray, also containing zephiran chloride, until the moment arrived for insertion in the patient's mouth. The course described is the normal and standard practice utilized by the profession.

On December 23, Mrs. Germann returned to Dr. Matriss' office. The 11 teeth were extracted under a general anaesthesia, the wounds were looked after, the bleeding was cared for with sterile gauze pads, and the acrylic denture was inserted in the upper jaw over the sockets from which the teeth had been removed. Mrs. Germann was then told not to remove the denture and to come back on the next day, December 24, for post-operative treatment and an examination of the denture. However, the doctor testified that she did not return until December 29. Plaintiff submitted some evidence indicating a visit on December 28. In any event, Dr. Matriss said that when Mrs. Germann returned the acrylic denture was not in her mouth. He testified also that she told him she had removed it on December 25 because her mouth was sore

and the denture was too long. He cut it down, replaced it and told her to keep it in her mouth. Mrs. Germann's husband who accompanied her to defendant's office asserted that he never saw the denture out of his wife's mouth, and he denied that she told Dr. Matriss she had removed it.

In the early evening of December 29, Mrs. Germann's jaws became more painful and her speech became impaired. Upon being called, the family physician gave some medication which did not help. The next morning Mrs. Germann was taken to St. Mary's Hospital in Passaic, and shortly thereafter she was removed to Mt. Sinai Hospital in New York City for treatment in a hyperbaric chamber. Unfortunately, this treatment was unsuccessful and Mrs. Germann died two days later on January 1, 1965. The cause of death was given as tetanus.

Plaintiff's suit is predicated upon a single narrow criticism of defendant's method of treating Mrs. Germann. The sole claim is that the acrylic denture had not been properly sterilized before it was inserted in the patient's mouth and that because of that fact the denture carried a tetanus spore which somehow entered one of the open wounds left by the extractions and thus produced the disease and the resulting death. No dentist was produced to support this theory. Instead, reliance was placed upon Dr. David J. Graubard, a physician licensed in New York, who was engaged at the time in that State in general practice of medicine and very limited surgery. He testified that while in the Army in 1935 and 1936 he had extracted some teeth and wired some fractured jaws. He had last wired a fractured jaw eight years prior to the trial of this case. He said also that he did considerable traumatic surgery after he came out of service and until he had a heart attack in 1964, and that, as a surgeon, he was familiar with the sterilization procedures of oral surgeons.

Dr. Graubard admitted he did not know the practice accepted and followed in the profession of dentistry as the standard for sterilization of acrylic dentures. He agreed that the use of an acrylic denture and its insertion in the patient's mouth immediately after extraction of teeth all represented

standard practice. He said the denture enables the patient to eat after removal of teeth. It helps also to create a proper basis for healing the jaw and to prepare the mouth for the application of a permanent denture. However, in answer to a hypothetical question which incorporated the method of making, handling, sterilization and insertion of the denture in Mrs. Germann's mouth he advanced the opinion "with reasonable medical certainty" that Dr. Matriss' method of sterilization of the denture constituted a departure from the standard of care exercised by "oral surgeons" practicing in the Bergen County area. (The inquiry for the standard practice is not limited to the geographical area of the dentist's or doctor's office or community. It is broader than that. See *Schueler v. Strelinger*, 43 *N. J.* 330, 344 (1964). But no such issue is involved here.) In his opinion the proper procedure to sterilize an acrylic denture to be inserted in a patient's mouth immediately after the extraction of teeth would be first to cleanse it with carbolic acid and then to rinse it off in alcohol. That method would, in his opinion, eliminate any tetanus spores that might be on the denture, while the method defendant pursued would not. Particularizing the charge of malpractice, the doctor said "the only ground" on which it was based was Dr. Matriss' failure to sterilize the denture (by means of carbolic acid and alcohol) so as to eliminate the tetanus spore from the denture itself.

There was no specification by Dr. Graubard as to the strength or the temperature of the carbolic acid required to accomplish effective sterilization, or as to the necessity or duration of immersion required. Furthermore he did not say anything about the effect of carbolic acid or alcohol on an acrylic denture or on the mouth or gums of the patient.

There is no dispute that the tetanus spore is a minute organism common to our environment. It is everywhere around us, in the air, dust, soil, water, food and human and animal feces. It may exist in the human mouth, being introduced there through many of the environmental exposures, including of course, ordinary food and drink. The mouth is

regarded as a harbor for an immense number of pathogenic organisms including the tetanus spore. See, *e. g., Mournet v. Sumner,* 19 *La. App.* 346, 139 *So.* 728 (1932) ; *Freche v. Mary,* 16 *So.* 2d 213 (*La. Ct. App.* 1944) ; *Morris v. Weene,* 258 *Mass.* 178, 154 *N. E.* 860 (1927) ; *Nevinger v. Haun,* 197 *Mo. App.* 416, 196 *S. W.* 39 (1917). The spore, so long as it retains that form, can remain in the human body for years in a virile but harmless state. Only when it encounters very special conditions which convert it into a tetanus bacillus or toxin and which permit it to multiply does it result in the tetanus disease. The bacillus is an anaerobic organism and consequently will not grow in the presence of oxygen. Thus if a spore finds a portal of entry, usually a wound of some kind, into the human body, where the supply of oxygen is cut off, it becomes a bacillus and continues to grow, pouring toxin into other areas of the body and ultimately producing the dread disease. The experts in the case agree that even if a spore enters a wound, converts to a bacillus and begins to spread toxin, growth will cease upon the reappearance of oxygen and will revert to the innocent spore-form. Fortunately tetanus is a disease of rare occurrence, and it is extremely rare from oral infection. The testimony revealed that in recent years an over-all total of 250-300 cases a year from all portals of entry have been recorded in this country. No information was supplied as to whether any of these cases resulted from oral surgery. It was undisputed, however, that tetanus following tooth extraction is extremely rare. In Dr. Graubard's 35 years of medical practice he had seen only three cases of tetanus. Two of them came from gunshot wounds, and the third from a wound caused by the patient stepping on a rusty nail.

It appears without contradiction in the testimony that there is no way of sterilizing the human mouth against tetanus spores. And as indicated above, such spores may be introduced into the mouth in the course of such normal activities as breathing, eating and drinking.

In view of the foregoing discussion, plaintiff's case stands or falls on certain alleged bases: (1) that defendant departed from accepted standards of the profession of dentistry in that he did not sterilize the acrylic denture by cleansing it in some undescribed fashion through use of carbolic acid of some unspecified strength for an unspecified period of time at an unspecified temperature, and then by rinsing it off in alcohol before inserting it in Mrs. Germann's mouth after the tooth extractions; (2) that in reasonable medical certainty the failure to so sterilize the denture permitted a tetanus spore to be on the denture at the time of insertion in her mouth; and (3) in reasonable medical certainty the spore left the denture, entered a tooth-extraction wound and suffered a cut-off of oxygen there causing the spore to transform into tetanus bacillus which caused the spread of toxin in sufficient measure to produce the tetanus disease and Mrs. Germann's death.

Defendant produced three expert witnesses in support of his defense. Dr. Joseph L. Downs, who was chief oral surgeon and dental director of Jersey City Medical Center and St. Mary's Hospital, Hoboken, and also associate clinical professor of surgery at the New Jersey College of Dentistry and Medicine, had been practicing dentistry for 30 years. He specialized in extractions and oral surgery and used immediate dentures in the course of his work. Such dentures are inserted in the patient's mouth immediately after the extractions and any necessary trimming of the alveolus. Dr. Downs reviewed Dr. Matriss' procedure in making, sterilizing and inserting the acrylic denture in Mrs. Germann's mouth and testified that it was standard procedure. He described it as the "optimum standard," "the highest standard that we know of," and as the practice that was then taught in dental schools. He opined that nothing more could have been done by defendant. The doctor said that it was impossible to completely sterilize an acrylic denture against a tetanus spore and that tetanus was extremely rare in oral surgery. Boiling or autoclaving the denture after fabrication would warp it and

change its shape. Furthermore, carbolic acid and acrylic dentures are not compatible and such acid would destroy the shape, form and contour of the denture.

Dr. Stanley L. Lane, the second expert for defendant, was a physician and a dentist licensed in both professions in New York and New Jersey. He specialized in head, neck and maxillofacial surgery, and, in that capacity, he was either attending or consulting surgeon in about 22 hospitals in New York, New Jersey and Connecticut. He taught oral surgery at Columbia University School of Dentistry for five years, and was teaching at the time of the trial at Albert Einstein College of Medicine and New York Polyclinic Hospital and Medical School. Dr. Lane has written approximately 40 articles for medical journals on surgery of the head, neck, oral cavity and related areas. He was familiar with and had used immediate acrylic dentures in his work. In his opinion the use of such dentures was standard in the profession in New York and New Jersey.

The doctor was given a hypothetical question embodying the full range of procedures followed by Dr. Matriss. In response he said that the described procedure was accepted in the profession as the standard of proper dental care and that it was "exactly the way it is done at all times." He testified further that the use of alcohol on an acrylic denture would discolor it and make it milky and cloudy. Carbolic acid would destroy it, and he had never used that acid himself nor ever heard of any dentist using it on such a denture. He conceded that the standard sterilization procedure adopted by the dental profession and pursued by Dr. Matriss would not accomplish complete sterilization. He added, however, that there was no way of doing so without destroying the denture.

The third expert appearing for the defense was Dr. Edward W. Hook, a physician specializing in internal medicine and infectious diseases. He had been successively an instructor in medicine at Emory University and Johns Hopkins medical schools, and an associate and professor of medicine at Cornell Medical College. At the time of trial he was also

Chief of the Infectious Disease Division at the New York Hospital, Cornell Medical Center. He was familiar with the tetanus spore which he said "is very common in our environment" and "is everywhere around us." This organism was described as round, microscopic in size, and capable of existing in the soil, in street dust and in many other areas for long periods of time. It can be "demonstrated with ease in the lower intestinal contents of fecal material of animal and man." In his opinion the incidence of the tetanus organism in specimens of the lower intestinal contents runs from 10 to as high as 40 or 50 percent. It is also found in the human mouth, but the incidence is not as high there. Also he testified that the spore is very resistant to heat and chemical disinfectants, including carbolic acid, and that he did not know of any way an acrylic denture could be sterilized against it.

The record shows that after Dr. Graubard had testified, Dr. Matriss went to a local drug store and purchased a bottle of ordinary carbolic acid. At his office that evening he inserted in the carbolic acid an acrylic denture of the same kind as that given to Mrs. Germann. Within a few minutes the denture was completely destroyed even though it was thereafter immersed in alcohol. (Both the bottle of acid and the ruined denture were marked in evidence.) The doctor said the acid and the acrylic material are not at all compatible, and that even if he had just washed the denture in carbolic acid it would eat into the pores of the denture and remain there. It was his opinion also that if the denture were merely washed with the acid and then rinsed immediately in alcohol, the operation would be too fast to accomplish complete sterilization.

As has been indicated above, in light of all the evidence, we consider Dr. Graubard's testimony regarding the requirement for sterilization of the denture by means of carbolic acid and alcohol as quite insubstantial and ambiguous because he offered no real explanation as to how and under what conditions the sterilization should be done. But even accepting his qualifications, albeit limited, to be an expert

witness, as within this Court's opinion in *Sanzari v. Rosenfeld*, 34 *N. J.* 128 (1961), and assuming that Dr. Graubard's opinion creates a factual issue as to whether defendant negligently departed from standard dental practice in failing to sterilize with carbolic acid and alcohol, plaintiff's case still presents a critical deficiency. A jury question as to defendant's liability is not presented simply by the introduction of some evidence of negligence. There must be evidence or reasonable inferences therefrom showing a proximate causal relation between defendant's negligence, if found by the jury, and the tetanus and resulting death of Mrs. Germann. *Swanson v. Wiesenfeld*, 24 *N. J. Super.* 576, 588–590 (*App. Div.* 1953); *Flanagan v. Smith*, 197 *Iowa* 273, 197 *N. W.* 49 (1924); *Mournet v. Sumner, supra*, 139 *So.* at 731; *Morris v. Weene, supra*, 154 *N. E.* 860; *Traverse v. Wing*, 256 *Mass.* 320, 152 *N. E.* 354 (1926); *Nevinger v. Haun, supra*, 196 *S. W.* 39; *Maluschka v. Murphy*, 173 *Wis.* 484, 180 *N. W.* 821 (1921).

As we have already said, the dental and medical witnesses are in agreement that the tetanus spore is ubiquitous. It is in the air, in water or in other liquids, in food, in soil and dust; in short it is common to our environment. It is found in the mouth as well as in other places in the human body. In fact the mouth is regarded as notoriously unsterile— ordinarily full of bacteria likely to produce infection at any time depending upon the condition and susceptibility of the person. For example see, *Flanagan v. Smith, supra*, 197 *N. W.* at 49; *Mournet v. Sumner, supra*, 139 *So.* at 731; *Traverse v. Wing, supra*, 152 *N. E.* at 355; *Nevinger v. Haun, supra*, 196 *S. W.* at 41. The possibility that the tetanus spore may be in a person's mouth at any time is undeniable. Fortunately, it is innocuous in the mouth or anywhere else in the body unless its supply of oxygen is cut off, and it then converts into the toxic bacillus. As Dr. Lane said tetanus infection following tooth extraction "is extremely rare—if it occurs." In the thousands of cases of infectious diseases with which he had personal contact or about which he knew "at

Columbia and at other medical schools and other institutions [he had] yet to see a case of tetanus, of proven tetanus that was caused after an extraction or after dental work, and no other means of sterility is used except the routine cleaning and washing, as we ordinarily know it."

All the doctors who spoke on the subject agreed that it is not possible to sterilize the human mouth against tetanus. When this inquiry was being made of Dr. Hook, plaintiff's counsel conceded: "There is no contention here that the human mouth is or should be sterile," and "I don't think it is possible to sterilize the mouth against anything." This is consistent with Dr. Hook's further statement that "in order to completely sterilize the oral cavity you would destroy tissue and cause death of tissue,[1] and * * * death of tissue is one of the circumstances that causes growth of an organism like tetanus."

As we have indicated, in the face of the proof in the case there is a reasonable possibility that the tetanus spore was already in Mrs. Germann's mouth when she came to Dr. Matriss' office to have her teeth extracted on December 23. It is possible that an existing tetanus spore went into one of the open wounds during or immediately after the extractions. When the acrylic denture was inserted in the patient's mouth the possibility must be conceded also that the spore was on it somewhere and somehow entered one of the open cavities. Moreover, although the denture covered the wounds it did not completely seal off the area of extractions. As Dr. Graubard said "it would not fit exactly." And we find the doctors in accord that in spite of the denture, the tetanus spore could have been introduced into the mouth and into the tooth sockets in the days following the extractions. Between December 23 and December 27 Mrs. Germann consumed food and drink and used utensils which concededly were un-

---

[1] For an illustration of the damage of carbolic acid to the skin and tissues, See *Picheloup v. Gibbons*, 9 *La. App.* 380, 120 *So.* 504 (1928), where a dentist carelessly spilled the acid on a patient's hands and thigh.

sterile, and which therefore might well have carried the spore. Some idea of the significance and the reality of these alternative possibilities can be gathered from Dr. Graubard's admission that if Mrs. Germann had removed the denture from her mouth after the insertion (as she said she did according to Dr. Matriss) he would change his opinion that the spore was on the denture when it was put in her mouth immediately after the extractions. This testimony means that the spore could have gotten into her mouth and into the gum wounds while the denture was out; also that it could have attached itself to the denture in the interval and entered the mouth and wounds on replacement of the denture. This admission of Dr. Graubard is not mentioned in order to indicate a finding one way or the other as to whether the denture was in fact removed. Since the fact of removal was in conflict we refer to it as this point only to emphasize the validity of the undisputed various possible causes of the existence of the spore in Mrs. Germann's mouth other than the alleged failure to properly sterilize the denture.

It should be remembered that the extractions took place on December 23. It could be said under the evidence that in the evening of December 29 the symptoms of tetanus began to manifest themselves. The opinions of the various doctors and dentists as to the incubation period of the tetanus bacillus following introduction of the spore into the tooth sockets ranged from two days to several weeks. Dr. Hook fixed the average time as seven to fourteen days. Dr. Graubard said it would be four to ten days. They all agreed, however, that the nearer the brain the portal of entry of the spore, the shorter the incubation time. Thus so far as the incubation period is concerned a tetanus spore could have been in Mrs. Germann's mouth before the extractions or could have gotten into an extraction cavity either during the removal or thereafter until December 27.

The various possibilities with respect to the existence of the spore which produced the fatal tetanus must be accepted as real because all of the expert evidence vouches for them.

In law, therefore, for purposes of evaluation in terms of causal relation to the origin of the fatal disease, they must be accepted as of equal substance. It is not sufficient for the plaintiff to prove existence of a number of possible circumstances which could have been responsible for the presence of the death-dealing spore in decedent's mouth. In the law's search for the reasonably probable cause, which alone serves to impose liability, such proof does not rise above more conjecture or speculation.

The law does not make a dentist a guarantor that no harm or unfavorable consequence will arise from his treatment. The obligation assumed by him is to exercise in the treatment of his patient the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field. Failure to have and to use such skill and care toward the patient as a proximate consequence of which injury results constitutes actionable negligence. *Schueler v. Strelinger, supra,* 43 *N. J.,* at 344. A plaintiff who charges a deviation from such standard of skill or care must assume the burden of establishing facts showing not only the deviation but also a fact equally essential to recovery of damages, *i. e.,* that the deviation was the reasonably probable cause of the injurious condition arising thereafter. If the proof adduced at trial simply shows a number of possible causes, only one of which could be charged to the dentist's lack of due care, for the presence of the factor which eventuated in injury the issue of the dentist's responsibility cannot be submitted to the jury for determination. To do so would be to authorize a decision on the basis of conjecture or speculation. It is only when there are circumstances present from which a reasonable man could find that the dentist's want of due care was more likely the probable cause that the issue of liability must go to the jury for determination.

In the present case, as indicated above, the evidence is barren of any circumstances on the basis of which a reasonable man could attribute any greater probative force to

the possibility that the tetanus spore was carried into Mrs. Germann's mouth on the allegedly negligently sterilized acrylic denture than to the possibility that (1) the spore was already in her mouth when the denture was inserted, or (2) that it entered her mouth thereafter, between December 23 and December 27. During that interval, she had prepared food for herself and others on Christmas day; she had consumed food and drink using utensils none of which were sterilized; and she had had contact with things which are incidental to our common environment and which could have introduced the spore into her mouth. Therefore, to send to the jury for decision the question whether the negligence of the defendant (if found by them) was the proximate cause—the more probable responsible cause of production of the fatal tetanus—would be to authorize the jury to reach an answer through guess or speculation. Compare, *Swanson v. Wiesenfeld, supra,* 24 *N. J. Super.,* at 588; *Quick v. Thurston,* 110 *U. S. App. D. C.* 169, 290 *F.* 2d 360, 362–363, 88 *A. L. R.* 2d 299 (D. C. Cir. 1961); *Flanagan v. Smith, supra,* 197 *N. W.* 49; *Mournet v. Sumner, supra,* 139 *So.* at 731; *Traverse v. Wing, supra,* 152 *N. E.* at 355; *Nevinger v. Haun, supra,* 196 *S. W.* at 41, 42; *Matuschka v. Murphy, supra,* 180 *N. W.* at 822; *Prosser, Torts* (2d ed. 1955) § 44, p. 222. Accordingly, the trial court committed error in denying defendant's motion for judgment in its favor at the close of the case. It follows also that the Appellate Division erred in affirming the trial court's action in that respect.

## II

The defense of decedent's contributory negligence was raised at the trial. In view of our decision, as expressed above, on the issue of proximate cause, it would not ordinarily be necessary to discuss that defense. But since we cannot accept the Appellate Division's conclusion respecting the nature of defendant's burden of proving contributory negligence in the general administrator's cause of action, the problem must be treated herein for future guidance of the trial courts.

At the outset an incidental aspect of the matter must be mentioned. The defense of contributory negligence was based on Dr. Matriss' testimony that after he had inserted the acrylic denture in Mrs. Germann's mouth she removed it in violation of his instructions, and that the denture was not in her mouth on December 28 or 29 when she returned to his office. Since the evidence indicated that the tetanus spore might have gotten into her mouth and then into a tooth socket while the denture was out, or might have been carried into her mouth on the denture when it was reinserted, defendant contends that if the jury found that the fatal spore was introduced in that fashion, removal of the denture should be deemed contributory negligence. We disagree. If the fatal spore entered a tooth socket because the denture was removed, such fact would establish only that the proximate cause of the fatal disease was not the allegedly negligent sterilization which permitted a spore to be on the denture when Dr. Matriss immediately after the extractions inserted it in Mrs. Germann's mouth. Such fact would demonstrate that the efficient producing cause of the tetanus was a cause for which the doctor was not responsible.

That incidental observation brings us to the principal problem to be considered with respect to contributory negligence—assuming it was a legitimate issue in the case.

As we have said, the complaint contained three counts. One was by the general administrator of the decedent's estate. It sought a recovery for the pain and suffering Mrs. Germann endured because of defendant's allegedly negligent treatment. The second count was by the same plaintiff in the capacity of administrator *ad prosequendum.* That claim was under the Death Act, *N. J. S. A.* 2A:31–1–5, and asked damages for the pecuniary losses sustained by the dependent next of kin. The third count was by plaintiff as husband of decedent to recover the medical and hospital expenses incurred before the death. Contributory negligence was pleaded as to all three counts. In charging on the subject the trial court instructed the jury in the traditional manner, *i. e.,* that the defendant

had the burden of proving contributory negligence by a fair preponderance of the credible evidence. The Appellate Division held this was correct so far as the action under the Death Act, *N. J. S. A.* 2A:31-1, 2, 4, was concerned. But as to the damage claim by the general administrator based on Mrs. Germann's pain and suffering before her death, it declared that the charge was contrary to *N. J. S. A.* 2A:81-2, the so-called Dead Man's Act, and therefore constituted reversible error.

*N. J. S. A.* 2A:81-2, as amended by *L.* 1960, *c.* 52, provides as follows:

"When 1 party to any civil action is a lunatic suing or defending by guardian or when 1 party sues or is sued in a representative capacity, any other party who asserts a claim or an affirmative defense against such lunatic or representative, supported by oral testimony of a promise, statement or act of the lunatic while of sound mind or of the decedent, shall be required to establish the same by clear and convincing proof."

Simply stated, plaintiff says and the Appellate Division agreed that the defense of contributory negligence against the pain and suffering claim is within this statutory language and, therefore, to bar recovery defendant must establish the defense by clear and convincing proof. We have a contrary view for reasons to be stated.

Preliminarily the incongruity of the divergent rules applied by the Appellate Division respecting proof of contributory negligence must be noted. If the ruling were to stand the jury would have to be told that on the claims of the husband as an individual and as administrator *ad prosequendum* defendant's burden would be to prove contributory negligence by the preponderance of the evidence — the greater weight of the credible evidence. Then to bar recovery on the pain and suffering claim such negligence would have to be established by clear and convincing evidence. We regard these differing rules as unrealistic and difficult to administer from a jury standpoint. Such a situation ought to be avoided unless *N. J. S. A.* 2A:81-2 clearly requires it.

■ It has been held that this statute does not apply to an action instituted by an administrator *ad prosequendum* to recover damages under *N. J. S. A.* 2A:31–1, 2, 4, for the wrongful death of the decedent. *Farago v. Sluke,* 90 *N. J. Super.* 356 *(App. Div.),* certif. den. 47 *N. J.* 568 (1966). The reason advanced was that the action was not brought "in a representative capacity." We concur in that holding. The decedent's estate is not affected by the outcome; the damages recovered are for the benefit of the persons designated in the Death Act. *N. J. S. A.* 2A:31–4. The administrator *ad prosequendum* is merely a nominal party—an agent authorized to bring the suit for the benefit of those individuals specified by the Legislature. *Kuykendall v. Edmondson,* 205 *Ala.* 265, 87 *So.* 882 (1921); *Beauvais v. Springfield Institute For Savings,* 303 *Mass.* 136, 20 *N. E.* 2d 957, 124 *A. L. R.* 611 (1939); *Tillinghast v. Maggs,* 82 *R. I.* 478, 111 *A.* 2d 713, 52 *A. L. R.* 2d 1004 (1955). It follows therefore that the traditional common law rule applies in such cases, and that the negligence or contributory negligence of a decedent is sufficiently established when demonstrated by the greater weight of the credible evidence.

Plaintiff maintains, however, that in the pain and suffering damage action he is pursuing a common law right as general administrator of Mrs. Germann's estate, and that any compensation awarded would constitute an asset of the estate. Therefore, he says, such a suit is clearly a representative one for the benefit of the estate, and consequently he is entitled to have the burden of proof rule specified in the statute applied in his favor, *i. e.,* that defendant must establish decedent's contributory negligence by clear and convincing proof. In support of his position he relies upon *Buska v. Aquinaldo,* 84 *N. J. Super.* 577 *(Cty. Ct.* 1964), the only case in New Jersey dealing directly with the problem. There the county court decided that the broad language of *N. J. S. A.* 2A:81–2 made it applicable to tort actions when a party was sued for damages as a representative of a decedent's estate on a charge of negligent operation of an automobile

by decedent. Accordingly, the court declared that the plaintiff in such cases must meet the statutory condition of proving the negligence by clear and convincing proof. If this conclusion were sound we would agree with plaintiff's assertion that the same rule must control proof of a decedent's contributory negligence (except, of course, in the Death Act cases referred to above).

In order to explain the reason for our view that *N. J. S. A.* 2A:81–2 is not concerned with dental malpractice negligence actions it is necessary to refer back to the statute as it existed prior to its 1960 amendment. The substance of the act in much more restrictive forms traces back to *L.* 1859, *c.* 166. It passed into section 4 of the evidence act of 1900 (*L.* 1900, *c.* 150) and, after certain amendments (*L.* 1931, *c.* 163), it appeared in the 1937 revision with somewhat revised language as *R. S.* 2:97–2. It remained in that form as 2A:81–2 until the 1960 amendment (*L.* 1960, *c.* 52). Prior to the 1960 amendment the act read:

"When one party to any civil action is a lunatic suing or defending by guardian or when one party sues or is sued in a representative capacity, no other party thereto may testify as to any transaction with or statement by the lunatic while of sound mind or with or by the decedent, unless:

a. The guardian of the lunatic or the representative of the decedent offers himself as a witness on his own behalf, and testifies to any transaction with or statement by his testator, intestate or ward, in which event the other party may be a witness on his own behalf as to all transactions with or statements by the lunatic while of sound mind or by the decedent, which are pertinent to the issue; or, * * *."

Other exceptions follow which need not be mentioned here.

If this pre-1960 language did not bar the type of testimony presented in the case before us as to negligence, contributory negligence or proximate cause, it ought to follow that the 1960 amendment which was designed to abolish the then existing bar was not intended by the Legislature to apply to the present and similar cases—at least in the absence of plain language indicating otherwise. Clearly the purpose of

the 1960 amendment was to remove the then existing disqualification whatever its nature and to substitute an obligation of proving by clear and convincing evidence a "claim or an affirmative defense" which had been subject to the pre-1960 act and which was to be "supported by oral testimony of a promise, statement or act * * * of the decedent."

As the Chancery Division noted in *Know the Facts, Inc. v. Ryan*, 48 *N. J. Super.* 453, 455 (*Ch. Div.* 1958), "[a] more widely criticized law [than the pre-1960 act] would be difficult to find." Authorities in the field of evidence have long regarded it as productive of more harm than good and as inimical to the basic search for justice. See, *Robertson v. Hackensack Trust Co.*, 1 *N. J.* 304, 320–322 (1949) (concurring opinion, Vanderbilt, C. J.) ; *Buska v. Aquinaldo, supra*, 84 *N. J. Super.*, at 584; 2 *Wigmore, Evidence* (3d ed. 1940), § 578, pp. 695-698; *McCormick, Evidence* § 65, pp. 142–144 (1954). Its repeal had been advocated frequently. See, *Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey* (1955), p. 30; 5 *Wigmore, supra,* § 1427, p. 209.

Questions relevant to our problem arose in other states in automobile accident cases when the driver of one car was killed and the other driver who survived sued the representative of the decedent's estate for damages. Should a statute such as the pre-1960 *N. J. S. A.* 2A:81–2 bar the survivor from testifying as to the facts and circumstances of the accident, particularly as to the part played by the decedent in the production of the accident? Or if a general administrator of the deceased driver sought damages for pain and suffering against the surviving driver, should the statute be deemed to silence the survivor as to the facts showing the negligence or contributory negligence of the deceased or absence of negligence on the part of the survivor? Differing views were taken by various states around the country. Some barred the surviving driver's testimony completely; some allowed him to describe the manner of his own operation before the accident; others permitted the survivor to testify only as to the

acts or conduct of the decedent himself; and still others, concluding that an automobile accident was not "a transaction with or a statement by" the decedent, held that the statute had no application and, consequently, allowed full testimony as to the details of the occurrence. See, Annotation, "Testimony—Transaction With Decedent," 80 *A. L. R.* 2d 1296, 1298–1308 (1961).

Some jurisdictions declared that the disqualification of witnesses was not favored and therefore the dead man's statute should not be extended by interpretation. For example, the Supreme Court of Arkansas in *Rankin v. Morgan,* 193 *Ark.* 751, 102 *S. W.* 2d 552 (1937), noting the juxtaposition of the words "transaction with" and "or statement by" the deceased, recognized a "certain affinity" between them. Then turning to Webster's New International Dictionary, Second Edition, it accepted the definition of "transaction" as "a business deal," an "act involving buying, or selling," and an "act or process of transacting." Thus it concluded that in its usual, common and ordinary acceptance, the word "transaction" did not cover the matter of a collision between vehicles. Likewise, in *Harper v. Johnson,* 162 *Tex.* 117, 345 *S. W.* 2d 277 (1961) the court said that the "impersonal, fortuitous and involuntary relationship" between two drivers, strangers to each other, whose automobiles collide causing the death of one of them should not be construed as a "transaction" within the meaning of the statute. Therefore the statute did not render the surviving driver incompetent to testify "as to his observations and description of the physical situation and the movements of the vehicles prior to and at the time of the accident." See also, *Turbot v. Repp,* 247 *Iowa* 69, 72 *N. W.* 2d 565 (1955); *Knoepfle v. Suko,* 108 *N. W.* 2d 456 (*N. D. Sup. Ct.* 1961); *Seligman v. Orth,* 205 *Wis.* 199, 236 *N. W.* 115 (1931).

The Supreme Court of Minnesota took a similarly narrow view of the limitation imposed by the statute. In *Spafford v. Hahn,* 274 *Minn.* 180, 143 *N. W.* 2d 81 (1966) defendant's testimony that, prior to his driving onto a frozen lake, de-

cedent had gone ahead and waved him on in his approach was not barred by the statute as testimony of "a transaction with or a statement by" the decedent; the testimony merely described decedent's conduct and actions just prior to defendant's entry onto the lake. And in *Simmons v. Larry,* 109 *Ga. App.* 424, 136 *S. E.* 2d 502 (1964) it was said that a surviving passenger of an automobile accident may testify as to the facts of the collision, including the reading of the deceased driver's speedometer just before the collision. See also, *Gibson v. McDonald,* 265 *Ala.* 426, 91 *So.* 2d 679 (1956); *Eisele v. Beaudoin,* 240 *Ark.* 227, 398 *S. W.* 2d 676 (1966); *Farley v. Collins,* 146 *So.* 2d 366 (*Fla. Sup. Ct.* 1962); *Herring v. Eiland,* 81 *So.* 2d 645 (Fla. Sup Ct. 1955); *Simmons v. Larry, supra; Christofiel v. Johnson,* 40 *Tenn. App.* 197, 290 *S. W.* 2d 215 (1956).

The restrictive interpretations of the statute represent a sensible limitation of its field of operation. In our judgment such a bar against admission of testimony, as that imposed by the pre-1960 statute, should be most strictly construed and not extended beyond the literal application of its terms. *Herring v. Eiland, supra; Simmons v. Larry, supra; Spafford v. Hahn, supra; Kurn v. Weaver,* 25 *Tenn. App.* 556, 161 *S. W.* 2d 1005 (1940). This view follows logically from the modern policy of the courts and the Legislature of our State to generally render all persons competent to testify, and to make the relevance of offered testimony the critical measure of its admissibility. See, *e. g., L.* 1960, *c.* 52; *Rule* 7, Rules of Evidence, *N. J. S. A.* 2A:84A-16; Comment to proposed Rule 7, *Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey* (1955), *supra, pp.* 9–13. *The Dead Man's Act, N. J. S. A.* 2A:81-2, if in existence in its pre-1960 form when the present negligence claim arose in 1964, would have been an exception to this modern policy. Consequently the act would have been construed strictly against exclusion and in favor of admission of any testimony relevant to the dental treatment received by Mrs. Germann.

As we have indicated above, *Buska v. Aquinaldo,* *supra,* 84 *N. J. Super.* 577, is the only case in New Jersey suggesting that *N. J. S. A.* 2A:81–2, in its pre-1960 form, would operate as a bar in an automobile negligence case to a survivor's testimony against a representative of a decedent driver concerning the facts of the accident. Although the issue is not entirely free from doubt, as revealed by the conflicting decisions throughout the country, in our opinion the sounder and more just construction is that this statute with its ancient roots was never intended to apply under those circumstances and that, if it existed today without the 1960 amendment it still should not apply to run-of-the-mill automobile negligence actions. We agree with the view of the jurisdictions mentioned above that the ordinary cause of action in negligence arising out of vehicle accidents or doctor or dentist malpractice ought not to be regarded as a "transaction with or statement by" the deceased. Negligence, contributory negligence, and proximate cause, which is an indispensable condition to either liability for negligence or non-liability because of contributory negligence, usually result from and are proved by independent acts or conduct, active or passive, of the parties involved. In a system of justice which has established as a general rule that all persons should be qualified to testify, and that disqualification should be the exception, there is no sound reason why the survivor in a negligence death case should be barred by the statute from testifying as to what he saw and did and what he saw the decedent do or fail to do, which independent actions or conduct coalesced without any mutuality of purpose to produce the accident or injury. The restrictive statute should not be extended to cases not strictly within its terms upon the idea that they fall within the evil intended to be guarded against. As an exception to the general rule of witness competency, it must be strictly construed as against the exclusion of such testimony and in favor of its admission. To illustrate in the present case: the issue of negligence, proximate cause and contributory negligence are so interwoven with and de-

pendent upon a single factual fabric that consideration of the total conduct of defendant and Mrs. Germann is necessary to the determination of each one of them. Thus the physical operations performed upon Mrs. Germann and the treatment administered to her as she sat passively in the dental chair are matters independently engaged in by defendant and they were open to observation by him and in large measure by anyone who happened to be present. His procedures should not be considered a "transaction" with her in the sense described above. His instruction to her not to remove the acrylic denture from her mouth is not a "statement" by her within the pre-1960 statutory bar. Rather it is a *res gestae* utterance by the dentist which as the case developed had a bearing on the issue of proximate cause. *Eisele v. Beaudoin, supra,* 398 *S. W.* 2d 676. When Mrs. Germann returned to defendant's office, the fact that the denture had been removed from her mouth was a physical fact open to anyone's observation. Moreover, her statement that she had taken the denture out some days earlier was an explanation of the observable physical condition brought about by her independent conduct engaged in out of defendant's presence and over which he had no control. Although it may be more strongly argued that her statement should be barred under the old statute, still, as a matter of strict construction thereof, it was simply an incident of a total scene which in its overall dimensions, in our judgment, would not constitute a "transaction" with decedent within the contemplation of the statute. But determination of that incidental evidence problem is not necessary to our decision here which basically concerns the applicability of the burden of proof standard under *N. J. S. A.* 2A:81–2, as amended by *L.* 1960, *c.* 52.

It follows from all of the above that if this malpractice case had been tried just before enactment of the 1960 act all of the testimony respecting Dr. Matriss' procedures and conduct in treating Mrs. Germann, as well as the testimony as to her independent conduct during the course of treatment and thereafter until her death would have been admissible.

Such testimony is simply the history of an event. In our judgment the earlier Dead Man's Act, construed strictly as would have been necessary, would not have prohibited Dr. Matriss, as the survivor, from describing the events and physical situations or his own movements or actions, or his instruction to her not to remove the denture. *Eisele v. Beaudoin, supra.* They were quite independent and apart, and in no way connected with personal actions or conduct on his patient's part. This characterization is equally applicable with respect to what he observed independently about her physical appearance, particularly that she had removed the denture from her mouth.

Since we are satisfied that in 1960 the 60-year-old New Jersey Dead Man's Act was not designed to apply to ordinary negligence actions such as those arising from vehicle collisions or dental malpractice, the next question is whether the Legislature in enacting *Chapter 52, L.* 1960 intended it to have more comprehensive coverage. The 1960 act eliminated the earlier bar of testimony as to "any transaction with or statements" by the deceased offered in support of a claim or defense. It made admissible all testimony in support of a claim or defense by or against a decedent's representative. But whenever the claim or defense is "supported by oral testimony" of a "promise, statement or act" of the decedent, the new statute declared such claim or defense must be established "by clear and convincing proof." The question is: Were the words "promise, statement or act" intended to relate to a broader category of claims or defenses than were covered under the pre-1960 law, and particularly so as to include vehicle and dental malpractice negligence claims? We think not.

The statement attached to the 1960 statute at the time of its introduction in the Senate said the purpose of the amendment to the Dead Man's Act was to eliminate "its bar to receiving the testimony." Obviously, this meant such testimony as the courts would reasonably deem to have been barred under the old law. Thus, so far as the statement is concerned the amendment had only two purposes: (1) to re-

move the existing testimonial bar, and (2) to substitute in its place a duty to establish by clear and convincing proof the type of claim or defense which previously could not have been supported by oral testimony of a party as to any transaction with or statement by the decedent. See, 5 *N. J. Practice (Clapp, Wills and Administration*, § 134, *p.* 243 (1962). Further, there is nothing in the language of the amendment to indicate the reason for use of "promise, statement or act" of the decedent in place of any "transaction with or statement by" the decedent. Most of the cases throughout the country involving application of the pre-1960 New Jersey-type of Dead Man's Act dealt largely with obligations arising on contract, express or implied, between the witness and the decedent, where negotiations, communications and transactions between them were the necessary basis of liability. With such a background it is not unreasonable to infer from the changed language a purpose generally to draw closer to obligations that really arise out of transactions which have mutuality as a characteristic.

 A promise is defined to be an undertaking, however expressed, either that something shall happen, or that something shall not happen in the future. *Restatement, Contracts* § 2, p. 3 (1932). It imparts mutuality and is "an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such manner to a promisee that he may justly expect performance and may reasonably rely thereon." *Corbin, Contracts* § 13, p. 20 (1952) ; see, *Stewart v. Reckless*, 24 *N. J. L.* 427, 430 (*Sup. Ct.* 1854). Since the words "statement or act" in the context of the 1960 act follow immediately after "promise," particularly as an amendment to a statute which has the long history described, it is reasonable to say that in association the three words have an analogous connotation. It is an ancient maxim of statutory construction that the meaning of words may be indicated and controlled by those with which they are associated. *City of Absecon v. Vettese*, 13 *N. J.* 581, 588 (1953) ; *Josefowicz v.*

*Porter,* 32 *N. J. Super.* 585, 591 (*App. Div.* 1954); *Friant v. Dolbow,* 41 *N. J. Super.* 84, 87 (*Ch. Div.* 1956); 2 *Sutherland, Statutory Construction* § 4908, *p.* 393 (1943). This maxim, *noscitur a sociis,* applies to associated words in a manner similar to application of the more familiar doctrine of *in pari materia* to statutes covering the same subject matter. 2 *Sutherland, supra* § 4909, p. 395. The rule is not absolute but it does serve as a helpful guide in ascertaining the intended scope of associated words or phrases in a statute where a particular word is followed by more general words, and the legislative purpose is unclear. In such situations, as this Court indicated in *Salomon v. Jersey City,* 12 *N. J.* 379, 388–389 (1953), it is wise to employ the maxim to avoid giving a breadth to the more general words which logic, reason and the subject matter of the statute do not show was clearly intended. .

It has always been the common law rule that negligence and contributory negligence should be established by the preponderance of the evidence. A legislative intention to substitute a test requiring proof of claims and defenses in such cases by clear and convincing evidence ought not to be accepted unless either expressly stated or demonstrated by inescapable implication. This view is especially pertinent here since we are satisfied that it would not have been proper to apply the pre-1960 Dead Man's Act to vehicle or dental malpractice negligence cases. Surely it cannot be said reasonably that reference to claims or defenses by or against an estate representative based on oral testimony "of a promise, statement or act" of a decedent inescapably reveals a legislative intention not only to draw such negligence cases into the former, more limited compass of the statute, but also to scrap the traditional rule relating to the burden of proof in such cases. These considerations make it at least uncertain that replacement of "transactions with or statement by" with "promise, statement or act" was intended to enlarge the scope of the act. The words "promise, statement or act" can sensibly be taken as an intended equivalent of the comprehensive term "transaction" in the pre-1960 act. More than this, under the

maxim alluded to, the words "statement or act" following in the wake of the more specific word "promise" can justifiably take color from it. Thus the connotation of the latter more general words ought to be restricted to a sense analogous to the specific word, and therefore confined to matters of the same kind. See, *e. g., Salomon v. Jersey City, supra,* 12 *N. J.* 379; *In re Hurlbut's Estate,* 180 *Misc.* 681, 44 *N. Y. S.* 2d 450, 455 (*Sur. Ct.* 1943). Looked at in this way the three new words can fairly be deemed to have no broader significance than the single word "transaction," and so to refer to claims or defenses dependent upon undertakings having their origin in an express or implied relationship of a personal and mutual nature.

For the reasons stated we hold that any doubt as to whether *N. J. S. A.* 2A:81-2 (*L. 1960, c. 52*) applies to vehicle or dental malpractice negligence actions should be resolved against its application. Consequently there is no burden to prove either negligence or contributory negligence in such cases by clear and convincing evidence. Therefore, *Buska v. Aquinaldo, supra,* 84 *N. J. Super.* 577, is overruled, and in the present case, assuming that the defense of contributory negligence was involved, the trial court did not err in charging the jury that defendant's burden was to establish it by a fair preponderance of the evidence.

We do not find it necessary to discuss the other trial errors found by the Appellate Division. They do not militate against the result we have reached.

As we have noted above, the trial court should have granted defendant's motion for judgment in his favor. Consequently the Appellate Division erred in reversing the jury verdict for the defendant and in ordering a new trial since the errors it found in the admission or rejection of evidence at the trial in no way affected defendant's right to have the motion granted. Accordingly the judgment of the Appellate Division is reversed and the judgment entered in the trial court for the defendant is affirmed for the reasons expressed herein. No costs.

■

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN— 7.

*For affirmance*—None.