# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5783-12T4

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

   v.

D.G.M.,

       Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**March 20, 2015**

**APPELLATE DIVISION**

Argued December 9, 2014 — Decided March 20, 2015

Before Judges Fisher, Accurso[1] and Manahan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hunterdon County, Docket No. FO-10-000135-13.

Peter D. Espey argued the cause for appellant (Hardin Kundla McKeon & Poletto, PA, attorneys; Mr. Espey, on the brief).

Jeffrey L. Weinstein, Assistant Prosecutor argued the cause for respondent (Anthony P. Kearns, III, Hunterdon County Prosecutor, attorney; Mr. Weinstein, of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

_____

[1]Although not originally on the panel, the parties have consented to Judge Accurso's participation without the need for further argument.

In this appeal of a contempt conviction, we consider whether defendant violated the "no contact or communication" provision of an amended final restraining order (FRO) — obtained by J.R. (Joan, a fictitious name), pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35 — by sitting near and briefly filming Joan at their six-year-old son's soccer game. Although such conduct falls within the FRO's prohibition on "communication," we conclude that defendant could not have fairly anticipated this result. In applying the doctrine of lenity, we reverse.

I

The record reveals that in 2006 Joan and defendant had a short romantic relationship which produced one child and a good deal of subsequent rancor. In 2010, Joan commenced a domestic violence action and obtained an FRO, which was later amended on a few occasions for child-related reasons. For example, an amended FRO entered in 2012 directed that defendant and Joan would communicate only by "the on-line family wizard system or [defendant's] father's cell phone." This amended FRO — in effect on the date in question — did not otherwise alter the standard provision in the original FRO that "prohibited" defendant "from having any (oral, written, personal, electronic

or other) form of contact or communication with" Joan, as well as other individuals not relevant here.[2]

As noted, the parties have a child and both are involved in the child's life. The Supreme Court has recognized the right "to raise one's children [is an] essential, basic civil right[] . . . far more precious . . . than property rights." Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212, 31 L. Ed. 2d 551, 558 (1972) (internal citations and quotation marks omitted). This fundamental right, however, may be limited and when defendant committed an act of domestic violence in 2010, a Family judge properly limited defendant's ability to communicate or contact the child's mother by entering an FRO. That consequence has generated further conflict, as evidenced by the proceedings leading to subsequent amendments to the FRO. And those amendments have chafed further, as revealed by the circumstances leading to this contempt prosecution.

The record reveals that defendant appeared at the child's soccer game on November 17, 2012. The FRO then in effect did not prohibit his attendance but it did prohibit defendant from having "any . . . contact or communication" with Joan, who also attended the game. Based on the allegation that defendant violated the FRO "by sitting directly next to" Joan during the

[2]In the FRO, the word "any" is presented in bold type.

soccer game and "us[ing] a cellular phone to videotape or take pictures" of her, defendant was charged with violating the FRO, a disorderly persons offense, N.J.S.A. 2C:29-9(b).

At the conclusion of a one-day trial, defendant was convicted in only one respect.[3]  In coming to that result,[4] the judge greatly relied on the video captured by defendant's cellphone that the judge described in the following way:

> [Joan] was seated in . . . a lawn chair, a folding chair.  The defendant . . . videoed her.  He was videoing other things, too, but you could see the camera panning.  He approached her, he was within a few feet of her.  She turned to her right.  As soon as she saw him, he immediately took the camera and . . . pointed it in [the] direction of the field.[5]

---

[3]Defendant was also charged with violating the FRO and making harassing communications in a separate complaint; the judge acquitted defendant of those charges.

[4]Defendant was sentenced to a one-year probationary term.

[5]Although the judge did not make a finding about the duration of the video, it is contained in the record on appeal and speaks for itself.  See State v. Diaz-Bridges, 208 N.J. 544, 566 (2012) (holding that when "factual findings are based only on . . . a recorded interrogation . . . equally available to the appellate court and are not dependent on any testimony uniquely available to the trial court, deference to the trial court's interpretation is not required").  Based on our examination, we note the entire video is approximately 100 seconds long.  During the critical stage referred to by the judge, defendant pointed the cellphone at Joan for approximately three seconds and then, when she turned to look at him, he abruptly turned the cellphone and videotaped what occurred on the soccer field for approximately three seconds.  Defendant then pointed the
(continued)

In making these comments, the judge mentioned defendant had placed his chair "within a few feet" of Joan, but he also discussed how defendant testified "he was maybe 10 or 15 feet away" and, ultimately, the judge never made a definitive finding as to the distance between Joan and defendant.

We do not interpret the judge's decision as convicting defendant for violating the FRO by being too near Joan. The decision instead rests on defendant's act of filming or photographing Joan:

> I am satisfied beyond a reasonable doubt that the defendant in fact did violate the terms of the restraining order. There is no question in my mind but that based upon what I have just stated, that <u>recording her was a form of contact</u>. And he should have known better. He had no right to contact her. So I find the defendant guilty beyond a reasonable doubt.
>
> [Emphasis added.]

Because defendant was acquitted in all other respects, we examine the sufficiency of the judge's conclusion that defendant violated the FRO's "no contact" provision by recording Joan's image with his cellphone or, in the trial judge's words, whether "recording [her] was a form of contact."

_____

(continued)
cellphone back at Joan for approximately five seconds while she watched the action on the soccer field.

We commence our analysis of that narrow issue by first assuming — once it is determined a plaintiff meets the definition of a victim of domestic violence, N.J.S.A. 2C:25-19(d), the defendant committed an act of domestic violence as defined by the Act, N.J.S.A. 2C:25-19(a), and there is a need to prevent further domestic violence, S.K. v. J.H., 426 N.J. Super. 230, 232 (App. Div. 2012); Silver v. Silver, 387 N.J. Super. 112, 127 (App. Div. 2006) — that the Act places no other limit on a court's power to restrain a defendant from engaging in a host of activities including but not limited to filming or photographing the victim. The Act authorizes entry of an order restraining a defendant, for example, from a range of locations — the residence, property, school or place of employment of the victim or the victim's family or household members and from "any specified place . . . frequented regularly by the victim or other family or household members." N.J.S.A. 2C:25-29(b)(6). And the Act authorizes restraints on various forms of interaction with the victim; a judge may "restrain the defendant from making contact with the plaintiff or others" and may further "forbid[] the defendant from personally or through an agent initiating any communication likely to cause annoyance or alarm including, but not limited to, personal, written, or

telephone contact with the victim or other family members, or their employers, employees, or fellow workers, or others with whom communication would be likely to cause annoyance or alarm to the victim."  N.J.S.A. 2C:25-29(b)(7).

Considering this broad grant of authority, N.J.S.A. 2C:25-29(b) (directing that courts are empowered to "grant any relief necessary to prevent further abuse"); see also State v. S.K., 423 N.J. Super. 540, 545 (App. Div. 2012); Zappaunbulso v. Zappaunbulso, 367 N.J. Super. 216, 226-27 (App. Div. 2004), there is no doubt that the judge who entered and amended the FRO could have crafted the order in any number of ways that would have rendered what occurred here a violation of the restraining order.  For example, defendant could have been precluded from attending the child's soccer games, or other school events, Finamore v. Aronson, 382 N.J. Super. 514, 520-21 (App. Div. 2006), or he could have been barred from coming closer to Joan than a particular amount of feet.  We also assume N.J.S.A. 2C:25-29(b) allows our courts to specifically prohibit a defendant from photographing or filming a domestic violence victim or others.  In short, we find nothing in the Act that would limit the flexibility possessed by courts in imposing

restraints for the protection of a domestic violence victim.[6] The real issue in dispute, therefore, concerns whether the FRO prohibited defendant from filming or photographing Joan.

## III

The FRO — insofar as it purports to bar the conduct the judge found occurred[7] — prohibited defendant "from having any (oral, written, personal, electronic or other) form of <u>contact or communication</u> with" Joan (emphasis added). Although the judge interpreted defendant's momentary filming of Joan as a form of "contact," we nevertheless examine whether defendant's

---

[6]We question but need not decide whether the conduct criminalized by <u>N.J.S.A.</u> 2C:29-9 — the violation of an FRO — may encompass a violation of a provision that is not expressly authorized by <u>N.J.S.A.</u> 2C:25-29(b). Stated another way, in recognizing the flexibility of a Family judge to craft an FRO that best protects the victim, we do not necessarily suggest the scope of <u>N.J.S.A.</u> 2C:29-9 expands with that flexibility. <u>See</u> <u>Cooper v. Cooper</u>, 144 <u>P.</u>3d 451, 457 (Alaska 2006) (observing that the statute defining the scope of a restraining order "implies that only" a violation of an authorized provision may constitute the crime of violating a protective order); <u>State v. Herren</u>, 339 <u>P.</u>3d 1126, 1130 n.1 (Idaho 2014) (recognizing the unlikelihood that "a judge issuing a no contact order has the power to define conduct by a particular individual which would constitute a crime other than contempt").

[7]The parties have argued the relevance or weight of various electronic communications. The judge, however, found these communications did not violate the FRO or constitute independent offenses. Consequently, we will not burden this opinion with their description.

actions may be interpreted as a form of "communication."[8]
"Contact" and "communication" are not defined by the Act or the
FRO in question.[9]

A

"Contact" has numerous commonly-used meanings. In this
context, we assume the Legislature in enacting N.J.S.A. 2C:25-
29(b)(7) — and the Family judge in crafting the FRO — intended
to limit the word to its common and ordinary meaning when used
as a verb, since in both the statute and the FRO the word was

---

[8]In light of the disposition of this appeal, we need not
determine whether double jeopardy principles bar upholding the
conviction on grounds other than those expressed by the judge,
i.e., by holding defendant engaged in a prohibited
"communication" instead of a prohibited "contact."

[9]The FRO also prohibits defendant "from stalking, following, or
threatening to harm, to stalk or to follow" Joan and others.
Stalking is defined as "a course of conduct directed at a
specific person that would cause a reasonable person to fear for
his [or her] safety or the safety of a third person or suffer
other emotional distress," N.J.S.A. 2C:12-10(b), and "[c]ourse
of conduct" is defined, in part, as "repeatedly maintaining a
visual or physical proximity to a person," N.J.S.A. 2C:12-
10(a)(1). Defendant was not charged with violating this portion
of the FRO, and we need not decide whether the conduct the judge
found to have occurred could form the basis for such a charge.
See H.E.S. v. J.C.S., 175 N.J. 309, 328-31 (2003) (determining
that an ex-husband's placement of hidden cameras and microphones
in his ex-wife's bedroom constituted stalking); N.G. v. J.P.,
426 N.J. Super. 398, 404-05, 418-20 (App. Div. 2012) (concluding
that defendant's picketing, while gesturing and making obscene
remarks, of his sister's home on twenty-nine occasions
constituted stalking).

used as a verb.[10]  In that regard, we think it likely "contact" as used here means "to get into contact or in touch with."  3 The Oxford English Dictionary 806 (2d ed. 1989).  Indeed, since the FRO bars defendant from having "any form of contact or communication" with Joan, we can reasonably assume the Legislature intended a meaning similar to or in harmony with "communication," a neighboring word in the statute and FRO.  See Shelton v. Restaurant.com, Inc., 214 N.J. 419, 440 (2013); Germann v. Matriss, 55 N.J. 193, 220 (1970).  But, while this may suggest the two words should be understood as having a similar scope or reach, "contact" certainly also includes, as any dictionary definition would suggest, a prohibition on the defendant actually "touching" the victim.  See Cooper, supra, 144 P.3d at 457-58 (reasoning that "contact" in this context includes "physically touching or communicating").  It would be quite anomalous to conclude that the Act, which was designed specifically to prevent domestic violence, would not authorize a restraining order that prohibits the defendant from physically touching the victim. We also think — although with less certainty — that "contact" in this setting may fairly be interpreted as

---

[10]For example, it cannot rationally be argued that the Act's intent was to use a common definition of the noun "contact," such as used in the following sentence:  "The news reporter had a reliable contact within the halls of Congress."

prohibiting a defendant from closely approaching the victim, i.e., "invading" a domestic violence victim's "personal space," or close enough to be heard in a normal tone of voice.[11]

"Communication," as its ordinary dictionary definition suggests in this context should be understood as the "imparting, conveying, or exchange of ideas, knowledge, information, etc. (whether speech, writing or signs)." See 3 Oxford English Dictionary, supra, at 578. This scope of banned behavior would obviously extend to a host of words or conduct, which, unlike "contact," would not necessarily be dependent on the distance between the defendant and the victim. A defendant prohibited from having any form of "communication" with a domestic violence victim might reasonably be found to have violated an FRO by telephoning the victim even when separated by many miles, or by gesturing at or toward the victim from across a room, from a passing automobile, or from the opposite side of a soccer field or baseball diamond. See, e.g., State v. Tunley, 294 P.3d 1092 (Hawaii Ct. App. 2013) (holding that defendant's "lengthy

_____

[11]Because our disposition of the appeal does not require it, we venture no further in defining how close a defendant may approach a victim without violating a similarly-worded FRO. When crafting an order restraining a defendant whose conduct suggests a likelihood of future testing of the order's limits, as may be what occurred here, the better practice may be for the Family judge to further define "contact" in the FRO by setting an actual distance in feet within which the defendant may not approach.

staring and grinning at" the complainant from "across the street" constituted a communication barred by the restraining order); State v. Elliott, 987 A.2d 513, 522-23 (Me. 2010) (upholding a conviction for violating a restraining order when the defendant "monitor[ed]" the complainant by parking in locations along the route of complainant's daily commute); Elliott v. Commonwealth, 675 S.E.2d 178, 181-82 (Va. 2009) (holding that defendant engaged in "contact of any type" but did not violate a restraining order by gesturing toward the victim's home from a block away; a dissenting judge disagreed with that interpretation).

B

The large and ever-growing body of law emanating from the Act demonstrates it is too late in the day for a defendant to suggest that either "contact" or "communication" would not include the words and conduct described in the section above. But this case provides a different and more unusual example.

Here, as we have observed, the judge found defendant to have violated the FRO by filming Joan while seated near her. Although the judge defined defendant's conduct as "contact" with Joan, we do not interpret his findings as suggesting defendant was "in contact" with Joan simply because he was seated nearby. Instead, we discern from the judge's findings that it was the

12

act of filming that constituted the forbidden "contact." In that regard, we think this conduct — if prohibited at all by this portion of the FRO — must fall within the scope contemplated by the word "communication" or only that part of "contact" which is synonymous with "communication." That is, if defendant violated the FRO it was because he was engaged in sending a message or conveying thoughts by pointing a cellphone's camera at Joan.

The message may not have been understandable to strangers but likely had meaning for the parties. Moreover, whether the message was intelligible is not the point. A defendant's mere act of filming or even simply staring at a victim sends a message and, in many instances, a message sufficiently alarming or annoying, or even threatening, so as to constitute the type of conduct the Legislature had in mind when enacting N.J.S.A. 2C:25-29(b)(7). Cf., State v. J.T., 294 N.J. Super. 540, 544 (App. Div. 1996). Accordingly, we hold a defendant restrained by a similarly-worded FRO engages in a "communication" by pointing a camera at a domestic violence victim from a standpoint close enough as to be observed by the victim. For this reason, we conclude that defendant engaged in communication with defendant when he filmed her, albeit very briefly, with his cellphone.

Our determination that defendant's conduct was a form of communication forbidden by the FRO, however, does not necessarily lead to an affirmance of defendant's conviction. Defendant is entitled to the application of the rule of lenity, first described by Justice Holmes as a principle that an accused is entitled to "fair warning . . . of what the law intends to do if a certain line is passed." McBoyle v. United States, 283 U.S. 25, 27, 51 S. Ct. 340, 341, 75 L. Ed. 816, 818 (1931); see also United States v. Bass, 404 U.S. 336, 347-48, 92 S. Ct. 515, 522, 30 L. Ed. 2d 488, 496 (1971); State v. Gelman, 195 N.J. 475, 482 (2008). Stated another way, "where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant." Bass, supra, 404 U.S. at 348, 92 S. Ct. at 523, 30 L. Ed. 2d at 497.

To be sure, in making this determination, courts may resolve statutory ambiguities by resort to extrinsic aids. Gelman, supra, 195 N.J. at 482. In fact, in prosecutions pursuant to N.J.S.A. 2C:29-9, the court is required to consider something outside the statute — the FRO itself — in determining whether the statute has been violated. Accordingly, whether a defendant has been given "fair warning" that his conduct constitutes a criminal act requires resort to and a

consideration of the clarity of the FRO. As we have already explored, an understanding of the reach of the "no contact or communication" provision of the FRO required an interpretation of that language. Because, until today's holding, no defendant would fairly be expected to understand that the filming or photographing of the victim falls with the scope of "contact" or "communication" contained in either N.J.S.A. 2C:25-29(b)(7), or an FRO crafted in accordance with that statute, we are compelled to employ the doctrine of lenity and reverse this conviction.

Before he could be fairly convicted, defendant had the right to know where the line existed between permitted and prohibited conduct. Although we are satisfied there is a host of prohibited conduct that a defendant would understand to be prohibited despite the generalities employed in the FRO, the precise conduct found by the judge to support the conviction — the filming of Joan — is not as assuredly encompassed by the Act, or the FRO entered here,[12] as most other conduct normally

---

[12]To be precise, defendant was convicted pursuant to N.J.S.A. 2C:29-9(b), which makes it a disorderly persons offense for a person to "knowingly" violate a domestic violence restraining order. This statute is clear; defendant was fairly apprised that his violation of the FRO would constitute an offense. But his conduct could not be criminalized under this statute if the FRO did not bar the conduct with sufficient clarity to communicate to the defendant that the conduct was barred. Accordingly, in assessing his guilt, the trier of fact was required to make a determination of whether defendant's conduct
(continued)

considered by our domestic violence courts. Because the Act does not further define the terms contained in <u>N.J.S.A.</u> 2C:25-29(b)(7), and because of the dearth of decisional law that would convey that this type of conduct is prohibited, the doctrine of lenity must preclude defendant's conviction here.

Moreover, the State was obligated to prove defendant's <u>knowing</u> violation of the FRO beyond a reasonable doubt. <u>N.J.S.A.</u> 2C:29-9(b); <u>see also</u> <u>S.K.</u>, <u>supra</u>, 423 <u>N.J. Super.</u> at 546; <u>State v. L.C.</u>, 283 <u>N.J. Super.</u> 441, 447 (App. Div. 1995), <u>certif. denied</u>, 143 <u>N.J.</u> 325 (1996). Because, until today's decision, it was not clear whether the brief filming of a victim in an open and public place constituted a form of prohibited communication, defendant could not have known to a sufficient certainty that he was violating the FRO by engaging in the conduct found to have occurred by the trial judge.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

(continued)
fell within the prohibitions described in the FRO and, in applying the doctrine of lenity, whether defendant fairly understood that his conduct violated those expressed prohibitions. In cases like this, whether there is an ambiguity sufficient to require application of the doctrine of lenity turns on the terms of the FRO and their interpretation.