**Cynthia M. COOPER, n/k/a Cynthia M. Hora, Appellant,**

v.

**Daniel R. COOPER, Jr., Appellee.**

Nos. S–11566, S–11649.

Supreme Court of Alaska.

Sept. 29, 2006.

24. 627 P.2d 1052, 1057 (Alaska 1981).

25. *Id.* at 1058.

26. *Id.* at 1059.

27. *Id.*

28. *Id.*

Cynthia M. Hora, pro se, Anchorage.

Karla F. Huntington, Law Office of K.F. Huntington, Anchorage, for Appellee.

Christine McLeod Pate, Kari Robinson, Sitka, for Amicus Curiae Alaska Network on Domestic Violence and Sexual Assault.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, and FABE, Justices.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

In these consolidated cases we review a denial of a petition for a domestic violence

protective order, and, in the separate divorce case, a grant of a mutual restraining order. We affirm the former and reverse the latter.

The main question presented is whether a person subject to a domestic violence order prohibiting him from being in the presence of or contacting a protected person commits the crime of violating a protective order by simply being in the same public place as the protected person. Our answer is "no." The crime requires a violation of statutory prohibitions that may be included in a protective order and being in the presence of a protected person is not among them. While a no-contacting order is an included statutory prohibition, merely being in the presence of a protected person without communicating with her is not "contacting" within the meaning of the statute.

## II. FACTS AND PROCEEDINGS

Cynthia Hora[1] and Daniel Cooper were a married couple when, in October 2003, Cooper was arrested for assaulting Hora. In November 2003 Hora petitioned for a long-term protective order and filed for divorce.

On November 28, 2003, a master issued a long-term domestic violence protective order against Cooper. The protective order prohibited Cooper from threatening to commit or committing acts of domestic violence, stalking, or harassment against Hora and her two children. This prohibition was to remain in effect until dissolved by a court. To date, it remains in effect. The protective order also contained prohibitions to remain in effect for six months, including a prohibition on being in the physical presence of, telephoning, contacting, or otherwise communicating directly or indirectly with Hora or her children. These proscriptions expired on May 28, 2004.

Hora alleges that on the day after the protective order was issued, she saw Cooper at the Dimond Mall in Anchorage. She alleges that he was staring at her in the housewares department of Gottshalks and that later that day she saw him outside the pet store. Cooper admits that he was at the Dimond Mall on the day in question, but denies having seen Hora. In January of 2004 Cooper drove past Hora and her son as they exited a barbershop. Cooper was driving slowly and he and Hora made eye contact.

In February 2004 Cooper pled no contest to a charge of family violence stemming from his October arrest. As a condition of probation, his sentence included a prohibition on contact with Hora or her children.

On April 28, 2004, Hora attended the morning session of the Alaska Bar Association Annual Convention held in Anchorage at the Captain Cook Hotel. When she noticed that Cooper was also attending the session, Hora requested that Cooper leave the conference, which he did. Cooper returned to the Captain Cook that afternoon. Hora saw Cooper at the Captain Cook and called the police. That evening Cooper was arrested for violating the November 28, 2003 protective order.

The next day, Cooper moved for clarification of the protective order. In response to this motion, Superior Court Judge John Suddock entered an order on April 30, 2004, finding that Cooper's attendance at the bar convention was not a per se violation of the order. Hora filed a motion for reconsideration, which was denied by Judge Suddock on May 5, 2004.

On May 26, 2004, Hora, in a new proceeding,[2] petitioned for a twenty-day ex parte and a long-term protective order against Cooper. Superior Court Judge Sharon Gleason granted Hora an ex-parte protective order based on Cooper's April 28 arrest for violating the November 28, 2003 protective order. When she granted the ex parte order, Judge Gleason was unaware that Judge Suddock had previously made and entered two decisions on the topic of Cooper's attendance at the bar convention.

Hora alleges that on May 27, 2004, Cooper slowed down in his car and "paced" her car for at least fifty feet while she was driving down "I" Street. Cooper denies this allega-

---

1. Cynthia Hora was Cynthia Cooper until August 2004, when her divorce became final.

2. That is, with a docket number separate from the November 2003 domestic violence proceeding.

tion and asserts that he was in his office when the incident allegedly occurred.

Cooper moved to dismiss the May 26 petition for protective order on the basis that Judge Suddock had already ruled that attendance at the bar convention was not a per se violation of the existing protective order. Judge Gleason denied the motion to dismiss, stating that she intended to "apply the standard set out by Judge Suddock in his order dated April 30, 2004, as well as the order denying reconsideration dated [May 5, 2004]."

On June 22, 2004, an evidentiary hearing was held on Hora's petition for a long-term protective order. At the conclusion of this hearing, Judge Gleason vacated the ex parte order of May 26 and denied Hora's petition for a long-term protective order.

On August 19, 2004, Judge Suddock held a hearing to review the parties' property distribution agreement, after which he issued a final decree of divorce. At Cooper's request, Judge Suddock also issued a mutual restraining order prohibiting future, direct contact between the parties, including in-person contact, mail, phone, and electronic contact.

Hora appeals Judge Gleason's denial of her petition for a long-term protective order and Judge Suddock's grant of a mutual restraining order.

## III. STANDARD OF REVIEW

■■■■■ "The interpretation of a statute is a question of law which involves this court's independent judgment."[3] Findings of fact are reviewed under the "clearly erroneous" standard.[4] We review the decisions to deny a protective order and grant a mutual restraining order for abuse of discretion.[5]

## IV. DISCUSSION

### A. Hora's Appeal Is Not Moot

This court requested supplemental briefing on the issue of mootness. If Hora prevailed in her appeal, she might be entitled to a

protective order containing provisions like those in the November 28, 2003 order that expired after six months. We conclude that this possibility is sufficient to avoid dismissal for mootness.

### B. Denial of the Protective Order

#### 1. Judge Gleason's decision

Hora's petition for a protective order was based on the allegation that Cooper had committed the crime of violating a protective order. Hora alleged that Cooper violated the order (1) at the bar convention, (2) at the Dimond Mall, (3) outside the barber shop, and (4) by pacing her on "I" Street. Judge Gleason applied Judge Suddock's previous rulings clarifying the November 28, 2003 order to Hora's first allegation. Hora claimed that Cooper had committed the crime of violating a protective order based on two theories. First, because his conduct amounted to stalking and stalking is prohibited by the protective order. Second, because his conduct amounted to contacting, which is also prohibited by the protective order. Judge Gleason concluded that the facts did not support entering a protective order under either theory.

As to stalking, Judge Gleason recognized that the placing-in-fear element required objective fear and concluded that the proof did not satisfy that standard. As to the no-contacting order, Judge Gleason found that there had been no violation either at the bar convention or in the other instances alleged by Hora. In so ruling, Judge Gleason accepted Judge Suddock's ruling that merely being in the presence of another party at a public place was not prohibited contacting. She also found that conclusion to be consistent with the statutory language since the applicable statute, AS 18.66.100(c)(2), "does not list precluding a respondent from being in the presence of the other party." As to each of the incidents described by Hora, at the bar convention and elsewhere, Judge Gleason

---

3. *Odum v. Univ. of Alaska, Anchorage*, 845 P.2d 432, 434 (Alaska 1993).

4. *Williams v. Williams*, 129 P.3d 428, 431 (Alaska 2006).

5. *See State v. Kluti Kaah Native Vill. of Copper Ctr.*, 831 P.2d 1270, 1272 n. 4 (Alaska 1992).

found that they at most involved "one to two second unplanned eye contact" which "did not constitute a violation of the protective order." She concluded: "[B]ased on the testimony I've heard, I find by a preponderance of the evidence that those were not intentional acts by Mr. Cooper to place himself in a situation where he would be having eye contact with ... Ms. Cooper." Judge Gleason also gave an example to illustrate her conclusion:

> Say he's at the barbershop, he's half shaved ..., and all of a sudden Ms. Cooper walks in. Does he need to say then oops, sorry, got to go, and his physical countenance left in disarray? No, I don't see it that way. But does that mean that he can turn his chair and stare at Ms. Cooper? No. So that's how I would interpret the order as it was then, in a manner that is consistent with the statute.

Hora argues that Judge Gleason applied an incorrect placing-in-fear standard with respect to stalking, and incorrectly interpreted the elements of the crime of violating a protective order with respect to the no-contacting order.

6. AS 18.66.100 in the form that it was in when the acts in question in this case took place provided in relevant part:

> (b) When a petition for a protective order is filed, the court shall schedule a hearing and provide at least 10 days' notice to the respondent of the hearing and of the respondent's right to appear and be heard, either in person or by an attorney. *If the court finds by a preponderance of evidence that the respondent has committed a crime involving domestic violence* against the petitioner, regardless of whether the respondent appears at the hearing, *the court may order any relief available under (c) of this section.* The provisions of a protective order issued under
> (1) (c)(1) of this section are effective until further order of the court;
> (2) (c)(2)-(16) of this section are effective for six months unless earlier dissolved by court order.
> (c) *A protective order under this section may*
> (1) prohibit the respondent from threatening to commit or committing domestic violence, stalking, or harassment;
> (2) *prohibit the respondent from telephoning, contacting, or otherwise communicating directly or indirectly with the petitioner;*
> (3) remove and exclude the respondent from the residence of the petitioner, regardless of ownership of the residence;

## 2. Elements of the crime of violating a protective order.

Alaska Statute 18.66.100(b) gives the superior court the authority to issue a protective order if it "finds by a preponderance of the evidence that the respondent has committed a crime involving domestic violence against the petitioner."[6] Under AS 18.66.990, crimes involving domestic violence include stalking and "violating a domestic violence order under AS 11.56.740."[7] The crime of violating a protective order is defined by AS 11.56.740(a):

> A person commits the crime of violating a protective order if the person is subject to a protective order
>
> (1) issued or filed under AS 18.66 and containing a provision listed in AS 18.66.100(c)(1)-(7) and knowingly commits or attempts to commit an act with reckless disregard that the act violates or would violate a provision of the protective order[.]

Stalking is conduct that is listed in AS 18.66.100(c)(1) and therefore when it oc-

> (4) direct the respondent to stay away from the residence, school, or place of employment of the petitioner or any specified place frequented by the petitioner or any designated household member;
> (5) prohibit the respondent from entering a propelled vehicle in the possession of or occupied by the petitioner;
> . . .
> (16) order other relief the court determines necessary to protect the petitioner or any household member.
> (Emphasis added.)

7. AS 18.66.990(3) provides in relevant part:

> "domestic violence" and "crime involving domestic violence" mean one or more of the following offenses or an offense under a law or ordinance of another jurisdiction having elements similar to these offenses, or an attempt to commit the offense, by a household member against another household member:
> (A) a crime against the person under AS 11.41;
> . . .
> (G) violating a domestic violence order under AS 11. 56.740[.]

Stalking is a crime against the person under AS 11.41, specifically, AS 11.41.260 (stalking in the first degree) and AS 11.41.270 (stalking in the second degree). The elements of stalking are discussed *infra* at pages 456-57.

curs and is prohibited by a protective order, it also may be a crime of violating a protective order under AS 11.56.740(a). We understand Hora's position to be that Cooper's alleged stalking conduct is a crime involving domestic violence (justifying a new protective order under AS 18.66.100(b)) because such conduct directly violated the criminal stalking statutes and because it amounted to the crime of violating a protective order under AS 11.56.740(a).

The relevant mental states referred to in AS 11.56.740(a) and in Judge Gleason's decision are defined in AS 11.81.900.[8]

### 3. Stalking

■ No argument is made that "stalking" as used in the protective order, and in AS 18.66.100(c)(1), has a different meaning than "stalking" under the statute making it an independent crime. Under the latter, "[a] person commits the crime of stalking ... if the person knowingly engages in a course of conduct that recklessly places another person in fear of death or physical injury...."[9] To be a "course of conduct" there must be "repeated acts of nonconsensual contact."[10]

Under the stalking statute, nonconsensual contact specifically includes "following or appearing within the sight of [the] person."[11] The court of appeals stated in *Kenison v. State*[12] that AS 11.41.270 "is not referring to the victim's subjective feelings of fright or intimidation. Rather, the statute requires proof that the victim reasonably perceived or apprehended the threat of death or physical injury."[13] This objective standard is individualized, and focuses on a whether a reasonable person in the same situation would also experience fear under the same circumstances. The court of appeals applied an individualized objective standard in *Kenison* by allowing the jury to consider evidence of the past relationship between the perpetrator and the victim.[14]

Hora argues that Judge Gleason did not apply an individualized objective standard and erred in finding that Cooper had not committed stalking. We conclude Judge Gleason did not err in finding that the evidence of stalking was insufficient to support the issuance of a protective order. Cooper's mere presence in Hora's line of vision, if sufficiently "repeated," could be nonconsen-

---

**8.** AS 11.81.900(a) provides in relevant part:

For purposes of this title, unless the context requires otherwise,

(1) a person acts "intentionally" with respect to a result described by a provision of law defining an offense when the person's conscious objective is to cause that result; when intentionally causing a particular result is an element of an offense, that intent need not be the person's only objective;

(2) a person acts "knowingly" with respect to conduct or to a circumstance described by a provision of law defining an offense when the person is aware that the conduct is of that nature or that the circumstance exists; when knowledge of the existence of a particular fact is an element of an offense, that knowledge is established if a person is aware of a substantial probability of its existence, unless the person actually believes it does not exist; a person who is unaware of conduct or a circumstance of which the person would have been aware had that person not been intoxicated acts knowingly with respect to that conduct or circumstance;

(3) a person acts "recklessly" with respect to a result or to a circumstance described by a provision of law defining an offense when the person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists; the risk must be of such a nature and

degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation; a person who is unaware of a risk of which the person would have been aware had that person not been intoxicated acts recklessly with respect to that risk[.]

**9.** AS 11.41.270(a).

**10.** AS 11.41.270(b)(1).

**11.** AS 11.41.270(b)(3)(A).

**12.** 107 P.3d 335 (Alaska App.2005).

**13.** *Id.* at 342.

**14.** *Id.* at 343–44 (allowing the jury to consider evidence of the couple's deteriorating relationship and a long series of nonconsensual contacts for the purposes of evaluating whether the victim's fear was reasonable). *See also Petersen v. State*, 930 P.2d 414, 432 (Alaska App.1996) (allowing the jury to consider evidence of the perpetrator's "long-standing course of conduct ... his persistent refusal to stay away from her, [and] his repeated presence at her workplace" to establish that the victim feared injury or death at the perpetrator's hands).

sual contact for purposes of the course-of-conduct element of stalking. But Judge Gleason relied on the insufficiency of evidence satisfying the placing-in-fear element, not the course-of-conduct element, in reaching her decision. Judge Gleason found that Cooper did not threaten, approach, or engage with Hora in any manner except to make momentary unplanned eye contact with her. Judge Gleason was fully aware of the parties' history and there is no indication that she did not apply an individualized objective standard with respect to the placing-in-fear element. We are unable to say that it was clearly erroneous for Judge Gleason to conclude that the requisite placing-in-fear element had not been met.

### 4. Contacting

■ The protective order of November 28, 2003, directed that Cooper "not be in the physical presence" of Hora, and that he refrain from contacting or otherwise communicating with her either directly or indirectly. Under AS 11.56.740(a)(1) in order to commit the crime of violating a protective order the protective order must contain "a provision listed in AS 18.66.100(c)(1)-(7)." Although this statute read literally only requires a violation of "a provision of the protective order" without specifying that the provision must be one "listed in AS 18.66.100(c)(1)-(7)," the section implies that only a violation of a provision listed in subsection .100(c)(1)-(7) may constitute the crime of violating a protective order.[15] Otherwise, there would be no reason to specify, as subsection .740(a)(1) does, particular provisions of subsection .100(c) that the protective order must contain.[16] This is significant in this case because the prohibition that Cooper not be in the physical presence of Hora is not a provision listed in subsection .100(c)(1)-(7). This does not mean that the in-the-presence prohibition is unauthorized. Under AS 18.66.100(c)(16) a court in framing a protective order may "order other relief the court determines necessary to protect the petitioner or any house-hold member." An order issued under AS 18.66.100(c)(16) may be enforceable by contempt, and possibly other means, but violation of such an order does not amount to the crime of violating a protective order as that crime is defined in AS 11.56.740(a)(1).

The protective order's prohibition on Cooper contacting or otherwise communicating with Hora is a provision listed in AS 18.66.100(c)(2). Thus if Cooper contacted Hora with the requisite mental state he committed the crime of violating a protective order. This crime, as we have seen, is a crime involving domestic violence. As such, it would have been grounds for granting the petition for a long-term protective order under AS 18.66.100(b).

Hora takes issue with Judge Gleason's conclusion that Cooper did not violate the no-contacting order in two respects. She contends first that "contacting" as used in AS 18.66.100(c)(2) should be construed to encompass appearing within the sight of the protected person. Second, she contends that Judge Gleason erroneously found that Cooper had to intentionally place himself where he could be seen by Hora, and that only knowing behavior is required by AS 11.56.740(a)(1). We reject Hora's first point. As to the second point, we agree that only knowing contacting is required but conclude that the error was harmless because there was no conduct that amounted to contacting within the meaning of AS 18.66.100(c)(2).

### a. Merely appearing within the protected person's sight is not contacting.

Hora's argument is that the statute defining the crime of stalking defines nonconsensual contact as including "appearing within the sight" of a protected person. She contends that this definition of "contact" should apply to the contacting prohibition listed in AS 18.66.100(c)(2). Although this is not an implausible argument, we reject it for the following reasons. "Contacting," as a verb, means in common usage physically touching

---

**15.** We assumed this to be the case in *State v. Strane*, 61 P.3d 1284, 1286 (Alaska 2003).

**16.** The principle that ambiguities in a criminal statute should be resolved by construing the stat-ute narrowly also supports this conclusion. *See State v. Andrews*, 707 P.2d 900, 907 (Alaska App. 1985), *adopted as the opinion of this court*, 723 P.2d 85 (Alaska 1986).

or communicating.[17] The stalking statute's use of the term, in conjunction with "nonconsensual," to include merely appearing within the sight of another person goes beyond the meaning of "contact" in normal usage. Words in statutes are to be construed in accordance with their normal usage unless there is some indication that a special meaning is intended.[18] In the present case the context in which "contacting" is used in AS 18.66.100(c)(2) argues in favor of adhering to the normal meaning. The statute's inclusion of the phrase "or otherwise communicating" immediately after "contacting" strongly suggests that nonphysical contact must involve some element of direct or indirect communication and does not merely mean coming within view. Further, the special and considerably broader meaning of "nonconsensual contact" in the stalking statute is not, as there used, all that is needed for a crime to take place. The contact must also be "repeated," so that it is a course of conduct, and it must place the protected person in fear. The need for these additional requirements to make stalking a crime argues against a construction that makes merely appearing in the sight of a protected person, without more, a crime.[19]

### b. Knowing contacting

As noted, Hora takes issue with Judge Gleason's conclusion that Cooper's conduct

had to be intentional, rather than merely knowing. The difference between the two concepts is that "a person acts 'intentionally' with respect to a result ... when the person's conscious objective is to cause that result...."[20] By contrast, a person acts "knowingly" when he knows that a particular result will occur even if his objective is not to cause that result.[21]

Hora's argument on this point is that

[t]he plain language of the statute requires proof of the following elements: (1) the perpetrator acted knowingly with respect to his conduct; (2) the perpetrator knew of the existence of the protective order; and (3) the perpetrator recklessly disregarded a substantial and unjustifiable risk that his conduct was prohibited by the order. Since the word "intentionally" does not appear in AS 11.56.740, there is no requirement that the perpetrator act intentionally.

We agree with this formulation. But our rejection of Hora's argument that an act of contacting within the meaning of AS 18.66.100(c)(2) occurred means that this point is moot. Cooper's mental state would only be relevant if conduct amounting to contacting occurred. There is no evidence that the momentary eye contact that Judge Gleason found to have occurred had communicative

---

17. Thus, Webster's Third New International Dictionary says the following concerning "contact" when used as a transitive verb, including its "ed/ing" forms: "to bring into contact: enter or be in contact with: a: to press against ... b: to make connection with: get in communication with ... c: to talk or confer with...."

18. AS 01.10.040(a) ("Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage. Technical words and phrases and those which have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to the peculiar and appropriate meaning.").

19. AS 18.66.100(c)(3) provides that a protective order may "remove and exclude the respondent from the residence of the petitioner" and subsection (c)(4) provides that a protective order may "direct the respondent to stay away from the residence, school, or place of employment of the petitioner or any specified place frequented by the petitioner or any designated household mem-

ber." A respondent's mere presence in any of these locations, where the petitioner is most likely to be found, could constitute violation of a protective order. But the active language of AS 18.66.100(c)(2) ("telephoning," "contacting," "communicating") suggests that an appearance in the presence of a protected person outside of these safeguarded locations would not constitute a violation, unless a fact finder were to determine that by appearing in the presence of the petitioner, the respondent knowingly communicated, directly or indirectly, with the petitioner.

20. AS 11.81.900(a).

21. AS 11.81.900(a)(2). Further, "knowingly" does not require definite knowledge. Rather, "when knowledge of the existence of a particular fact is an element of an offense, that knowledge is established if a person is aware of a substantial probability of its existence, unless the person actually believes that it does not exist." Id.

content. Thus, contacting did not take place.[22]

### C. The Mutual Restraining Order

 Hora also challenges the mutual restraining order entered by Judge Suddock in the divorce proceeding, contending that the court had no basis to impose any restraint against her. Under *Siggelkow v. State,* where an "independent basis" exists for a restraining order, "it may issue pursuant to the court's equitable power."[23] However, the court may not issue an order "merely because the parties are before it in a divorce action."[24] Because this is a mutual order, there must be an independent basis for the order against each party. Judge Suddock's basis for the mutual restraining order was that "[b]oth parties have expressed a concern for their safety from the other party. There has been a high level of animosity and distrust exhibited throughout the litigation."

In our view, an expression of concern by the parties is insufficient to establish an independent basis for the order. A more specific factual basis was required to support Cooper's belief that there will be future acts of harassment or contact by Hora. Judge Suddock noted that Hora had done nothing that "would justify [Cooper] from having concern about physical violence." Likewise, a general acknowledgment of animosity and distrust during a divorce is insufficient to establish an independent basis for the order.[25] We conclude that because the order lacked an independent basis, it was an abuse of discretion to issue the mutual restraining order.

## V. CONCLUSION

In No. S–11566 we AFFIRM the superior court's denial of a domestic violence protective order. In No. S–11649 we REVERSE the decision of the superior court granting a mutual restraining order and REMAND the case to the court with directions to VACATE the mutual restraining order.

CARPENETI, Justice, not participating.

---

**22.** Hora makes two other arguments with respect to the protective order. She argues that Judge Gleason improperly gave collateral effect to Judge Suddock's ruling that Cooper's attendance at the bar convention was not a per se violation of the protective order. This argument would only be of importance if Judge Gleason's order was not, as a stand-alone order, affirmable without consideration of Judge Suddock's ruling. Here, both Judge Gleason and Judge Suddock correctly concluded that Cooper's presence at the bar convention was not, per se, a violation of the protective order. Thus Judge Gleason's order does not require the shielding from review on appeal that application of the doctrine of collateral estoppel might give it.

Hora also argues that the superior court denied her request for a long-term protective order based in part on the protection provided by Cooper's no-contact probation condition. While Judge Gleason did mention the criminal provision, it does not appear from the transcript that the existence of the no-contact probation condition affected the final judgment.

**23.** 731 P.2d 57, 61 (Alaska 1987).

**24.** *Id.*

**25.** As a matter of policy, mutual restraining orders have come to be disfavored in domestic violence cases. *See* AS 18.66.130(b) ("A court may not grant protective orders against the petitioner and the respondent in the same action under [the Domestic Violence and Sexual Assault] chapter."). We believe this should carry over to divorce litigation as well when only one partner has committed acts of domestic violence.