**William Peter PASTOS, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–9425.

Court of Appeals of Alaska.

May 18, 2007.

Joe P. Josephson, Anchorage, for the Appellant.

Blair M. Christensen, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Christine M. Pate, Sitka, for *amicus curiae* Alaska Network on Domestic Violence and Sexual Assault, aligned with the State.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

In August 2005, William Peter Pastos pleaded no contest to four counts of engaging in unlawful contact with his ex-girlfriend, Kristen Yearsley. On each of the four counts, District Court Judge Sigurd E. Murphy sentenced Pastos to serve 15 days in jail, with another 345 days suspended on condition of Pastos's good behavior during ten years' probation. After imposing this sentence, Judge Murphy ordered Pastos to report to jail the next morning. In the interim, as a condition of release, Judge Murphy ordered Pastos to have no contact, direct or indirect, with Yearsley.

After Pastos left the courtroom, he went to the bank and deposited a check for $2000 that Yearsley had written to him more than three years earlier (as payment for house painting). Based on Pastos's act of negotiating this check, Judge Murphy found that Pastos had engaged in indirect "contact" with Yearsley, thus violating the terms of his release.

Violating the terms of one's release is a crime under AS 11.56.757(a). Based on Pastos's commission of this new crime, Judge Murphy revoked Pastos's probation and sentenced him to some of the previously suspended jail time. Pastos now appeals.

The question is whether Pastos's act of depositing Yearsley's check constituted a "contact" with Yearsley in violation of Pastos's conditions of release. We conclude that, given the circumstances of this case, Judge Murphy reasonably found that Pastos cashed the check with the knowledge that his action would, in all probability, cause Yearsley emotional distress and fear. Because Pastos acted with this culpable mental state, his act of cashing the check constituted a prohibited "contact" with Yearsley.

*Additional underlying facts, and Judge Murphy's ruling*

Yearsley wrote the check to Pastos in 2002 in payment for painting her house. According to Yearsley, Pastos refused the check (declaring that he performed the labor out of

friendship), so Yearsley kept the check and put it in a locked box in her house.

When Yearsley presented her victim-impact statement at Pastos's sentencing hearing, she mentioned this check and the fact that she thought the check was still in her possession. (Yearsley told the court that she had last seen the check in the box sometime in the spring of 2005.) In her victim-impact statement, Yearsley told the court that she now thought that Pastos had refused the check "to make [her] feel obligated", and that she had "[paid] for it time and time again emotionally".

Later, after Pastos cashed the check and the State petitioned Judge Murphy to revoke Pastos's probation, Yearsley told Judge Murphy that she believed that Pastos had broken into her house and stolen the check—and that he cashed the check out of malice and vindictiveness, to hurt her financially, and to show her that he continued to have power over her.

At the probation revocation hearing, Pastos offered a different account of what happened to the $2000 check. According to Pastos, he accepted the check when Yearsley wrote it, but he kept the check and did not cash it. Pastos testified that he kept the check clipped behind the visor of his truck from 2002 to 2005. (Two other witnesses corroborated this.) Pastos said he did not wish to cash the check, but he kept it, thinking that he might cash it one day if he really needed the money.

Then, at Pastos's sentencing hearing, Yearsley spoke about the check during her victim-impact statement. According to Pastos's version of events, Yearsley's remarks during the victim-impact statement reminded him that he still had the check—and that the check was a potential source of needed funds, now that he was going to jail. Pastos testified that, as he left the sentencing hearing, he spoke to his ex-wife, Gina Pastos, and asked her what he should do:

> *Pastos:* I looked at the check, [and I asked Gina,] "What do you think? [Do] you think I could cash this?" And she said, "Yeah, I think you can cash it; you did the work." And I said, "Yeah, I think so, too."

Pastos told Judge Murphy that he did not think that depositing the check "could possibly be any kind of contact with [Yearsley]", nor did he think that his act of negotiating the check would cause Yearsley to be afraid of him.

After hearing this conflicting testimony, Judge Murphy found that, contrary to Yearsley's testimony, the check had not been in her possession. Judge Murphy found, instead, that Pastos had had custody of the check at all pertinent times.

Nevertheless, Judge Murphy found that Pastos engaged in indirect contact with Yearsley when he negotiated the check:

> *The Court:* Mr. Pastos ... not only knew of the court's order against any indirect contact, but [he] was aware [that it] clearly prohibited him from doing anything that would intrude upon [Ms. Yearsley]. I also [find], based on the totality of the facts in this case, ... that [Mr. Pastos] knew exactly what he was doing by cashing the check—that it wasn't a matter of just wanting the money because he was impoverished (which I assume to be true), but [that] he [also] knew as he left the courtroom and went to cash that check that it would have an effect on [Ms. Yearsley]. And, therefore, [it] was an indirect contact. This is not an innocent cashing of a check. It is a purposeful action on his part to affect adversely the victim in this case, ... within hours after being warned not to.... Mr. Pastos was aware of a substantial probability that his conduct violated [his conditions of release] and would have the deleterious effect [that] it apparently has had on the victim.

*Why we conclude that Pastos's act of cashing the check constituted a prohibited "contact" with Yearsley*

■ The true source of the problem in this case is the ambiguity of the word "contact".

In our criminal code (Title 11) and in AS 18.65 and 18.66, the chapters of our statutes that govern protective orders in cases of stalking, sexual assault, and domestic violence, the word "contact" appears in over twenty statutes. Leaving aside those in-

stances where the statutory reference is explicitly to "sexual contact" or to "physical contact", there are eight statutes that use the term "contact" to refer to an interaction between two people.[1]  But with one exception, these statutes have no pertinent, clarifying definition of exactly what sort of interaction they are referring to.[2]

The Alaska Supreme Court noted in *Cooper v. Cooper*, 144 P.3d 451 (Alaska 2006), that the normal meaning of the verb "contact" is to either physically touch or communicate with another person.  *Id.* at 457–58.  And, with the exception of the stalking statute, *see* AS 11.41.270(b)(3), it appears that our statutes employ the word "contact" in this normal sense.[3]

In *Cooper*, our supreme court held that the word "contact" is used in this normal sense in AS 18.66.100(c)(2)—the statute governing protective orders for victims of domestic violence.  *Id.* at 458.  The supreme court noted that this statute employs the word "contact" as part of the phrase, "may ... prohibit the respondent from telephoning, contacting, or otherwise communicating directly or indirectly with the petitioner".  The court then concluded:

The statute's inclusion of the [words] "or otherwise communicating" immediately after [the word] "contacting" strongly suggests that [the] nonphysical contact [that a court may prohibit in a protective order] must involve some element of direct or indirect communication. . . .

*Cooper*, 144 P.3d at 458.

Based on this clarification of the meaning of "contact", the supreme court concluded that there was no violation of a domestic violence protective order when the plaintiff and the respondent attended the same professional gathering and the respondent made brief eye contact with the plaintiff.  The court explained, "There is no evidence that the momentary eye contact that [the superior court] found to have occurred had communicative content.  Thus, contacting did not take place."  *Id.* at 458–59.

In the present case, the prohibition on Pastos's "contacting" Yearsley was contained in Pastos's conditions of release rather than in a domestic violence protective order issued under AS 18.66.100.  Nevertheless, the district court imposed those conditions of release because Pastos had just been convicted of engaging in unlawful contact with Yearsley—an offense which, under AS

---

1.  *See* AS 11.41.270 (defining the crime of stalking); AS 11.56.750 & 755 (defining the crimes of first- and second-degree unlawful contact); AS 11.61.220 (defining the crime of fifth-degree weapons misconduct, which includes failing to apprise a police officer that you are carrying a concealed weapon); AS 11.46.340 (defining emergency use of premises as a defense to a prosecution for burglary or criminal trespass); AS 18.65.850 (defining the authorized protective orders for victims of stalking and sexual assault); and AS 18.66.100 & 130 (defining the authorized protective orders for victims of domestic violence).

2.  The one exception is AS 11.61.220(j), which defines the phrase "contacted by a police officer".

  Although the second-degree stalking statute contains a definition of "nonconsensual contact", *see* AS 11.41.270(b)(3), the Alaska Supreme Court has held that this definition "goes beyond the meaning of 'contact' in normal usage", and that this definition is therefore not controlling on the question of what constitutes "contact" in the context of a protective order prohibiting one person from contacting another.  *See Cooper v. Cooper*, 144 P.3d 451, 457–58 (Alaska 2006).

3.  *See* AS 11.56.750(a)(2) ("either directly or indirectly, knowingly contacts or attempts to contact the victim or witness in violation of the order"); AS 11.61.220(j) (" 'contacted by a peace officer' means stopped, detained, questioned, or addressed in person by the peace officer for an official purpose"); AS 11.46.340(2) ("as soon as reasonably practical after the [emergency] entry, use, or occupancy [of the premises], the person contacts the owner of the premises, the owner's agent or, if the owner is unknown, the nearest state or local police agency"); AS 18.65.520(a) ("A peace officer ... shall orally and in writing inform the victim ... [that they] have the right to [seek] a protective order that may include ... prohibit[ing their] abuser from stalking, harassing, telephoning, contacting, or otherwise communicating with [them], directly or indirectly"); AS 18.65.850(c)(2) ("A protective order issued under this section may ... prohibit the respondent from telephoning, contacting, or otherwise communicating directly or indirectly with the petitioner or [other] designated household member"); AS 18.66.100(c)(2) ("A protective order under this section may ... prohibit the respondent from telephoning, contacting, or otherwise communicating directly or indirectly with the petitioner").

11.56.750(a)(2), is defined as "either directly or indirectly, knowingly contact[ing] or attempt[ing] to contact the victim or witness in violation of [a court] order".

In this context, it is reasonable to conclude that when Judge Murphy directed Pastos to have no contact, direct or indirect, with Yearsley, the judge was using the word "contact" in the same sense as it is used in the protective order statute (AS 18.66.100) and the unlawful contact statute (AS 11.56.750).

■ *Cooper* holds that, for purposes of AS 18.66.100, "contact" means more than simply performing an act that impinges on another person in some way. Rather, "contact" requires "[an] element of direct or indirect communication". *Id.* at 458. In other words, the finder of fact must be convinced that "the respondent knowingly communicated, directly or indirectly, with the petitioner" when the respondent engaged in the specified act. *Id.* at 458 n. 19.

As the *Cooper* opinion suggests, this requirement of communication means that the same physical actions may or may not constitute a prohibited "contact", depending on the circumstances.

Although the supreme court's decision in *Cooper* was issued more than a year after Judge Murphy made his ruling in Pastos's case, Judge Murphy engaged in a very similar analysis when he assessed whether Pastos's act of cashing the check constituted a prohibited "contact" with Yearsley.

As he began his remarks, Judge Murphy commented that Pastos was aware that his conditions of release "prohibited him from doing anything that would intrude" on Yearsley. If the judge had stopped there, we would vacate his order and direct him to reconsider this matter—because, as we explained above, "contact" does not encompass every act that impinges on another person.

But Pastos cashed the check shortly after he heard Yearsley say (in her victim-impact statement) that she thought the check was still in her house, and that she believed Pastos had earlier broken into her house and had moved her belongings around.

Under these circumstances, one might reasonably conclude that Pastos knew (*i.e.,* Pastos was "aware of a substantial probability" [4]) that his act of cashing the check would cause Yearsley emotional distress and fear—that this action would communicate to her, indirectly, that she should be afraid of Pastos and his continuing influence on her life. This is, in fact, the conclusion that Judge Murphy drew:

> *The Court:* I [find], based on the totality of the facts in this case, ... that [Mr. Pastos] knew exactly what he was doing by cashing the check—that it wasn't a matter of just wanting the money because he was impoverished (which I assume to be true), but [that] he [also] knew as he left the courtroom and went to cash that check that it would have an effect on [Ms. Yearsley]. And, therefore, [it] was an indirect contact. This is not an innocent cashing of a check. It is a purposeful action on his part to affect adversely the victim in this case.... Mr. Pastos was aware of a substantial probability that his conduct violated [his conditions of release] and would have the deleterious effect [that] it apparently had on the victim.

In other words, Judge Murphy found that Pastos was not merely cashing the check to obtain money—although the judge conceded that this may have been one of Pastos's reasons for cashing the check. Judge Murphy found that, in addition to whatever monetary need Pastos may have had, Pastos also knew that, under the circumstances, his act of cashing the check would constitute a communication to Yearsley.

Cases on this point of law are few, but we note that the Mississippi Court of Appeals reached a similar decision, on analogous facts, in the case of *Broome v. Broome,* 832 So.2d 1247 (Miss.App.2002).

*Broome v. Broome* arose from a dispute between a divorced couple, Paul and Cindy Broome. Paul had been ordered to make support payments to Cindy. Over the course of a year and a half, Cindy accumulated a total of twenty-nine checks that Paul gave her for child support and medical expenses.

4.  AS 11.81.900(a)(2).

Then, over the course of a single week (the week of Paul's birthday), Cindy presented all twenty-nine checks to Paul's bank for payment—resulting in the bank's dishonoring twenty-three of the checks for insufficient funds.[5]

Paul asked the court to hold Cindy in contempt. At the ensuing hearing, the testimony offered by Paul and Cindy "[was] in sharp dispute".[6] Cindy testified that Paul had asked her to hold the checks, while Paul denied that he had ever asked Cindy to hold a check for more than two days.[7] The chancellor who heard the case decided that Cindy was not telling the truth, and the chancellor therefore held Cindy in contempt of court.[8]

On appeal, Cindy argued that the chancellor's ruling was "arbitrary and capricious and against the overwhelming weight of the evidence".[9] But as the Mississippi Court of Appeals explained, "[t]he chancellor saw it differently":

> In his findings, the chancellor [concluded that] it [was] evident that [Cindy] Broome's intent was to harass [Paul] Broome.... [S]he could have simply allowed him to pay the checks, something the evidence shows he made every effort to do. In addition to holding the checks in the first place, some [from] as early as March of 2000, and [then] attempting to negotiate 29 of them the week of Mr. Broome's birthday, perhaps the most illustrative evidence of her underlying motivation was the fact that she never told her attorney that Mr. Broome had tried to pay the checks and that she had been in contact with and had received several pieces of correspondence from Mr. Broome's attorney trying to pay them prior to instructing her attorney to file suit on the checks. Thus, to this Court, Mrs. Broome's motivation was clear. She wanted to [cause] Mr. Broome yet more financial problems and emotional distress.

*Broome,* 832 So.2d at 1253. The court of appeals concluded that the chancellor's finding of fact—"that Cindy's actions were designed to harass Paul"—was supported by the record and was not clearly erroneous.[10] Thus, the appeals court upheld the chancellor's ruling that Cindy had committed a contempt of court.

The *Broome* case and Pastos's case are analogous, in that both cases involve an act—the presentation of a negotiable instrument to a bank—that would be perfectly legal in most instances. But in the particular context of *Broome,* and in the particular context of Pastos's case, the facts supported a reasonable conclusion that the cashing of the check was done for an additional reason besides a desire to get the money. In both instances, the act of cashing the check could reasonably be viewed as a means of communicating with, and causing distress to, the maker of the check.

This is not to say that this conclusion was foregone. Rather, it was a question of fact to be resolved by the judge, based on the totality of the evidence. In Pastos's case, Judge Murphy weighed the competing evidence and found against Pastos. Judge Murphy found that Pastos knew that his act of cashing the check would, under the circumstances, instill emotional distress and fear in Yearsley—that it would be an act of communication.

Judge Murphy's resolution of this question of fact is not clearly erroneous, and we therefore uphold it.[11] Given this finding, Judge Murphy properly concluded that Pastos had violated the "no contact" provision of his conditions of release.

The judgement of the district court is AFFIRMED.

---

5. *Broome,* 832 So.2d at 1251–52, 1253.

6. *Id.* at 1252.

7. *Id.*

8. *Id.* at 1252–53.

9. *Id.* at 1252.

10. *Id.* at 1253.

11. *See Slwooko v. State,* 139 P.3d 593, 598 (Alaska App.2006); *Wilburn v. State,* 816 P.2d 907, 911 (Alaska App.1991).