**William Peter PASTOS, Petitioner,**

v.

**STATE of Alaska, Respondent.**

**No. S–12745.**

Supreme Court of Alaska.

Oct. 24, 2008.

---

**12.** AS 25.25.613(a).

**14.** Alaska R. Civ. P. 90.3 cmt. VIII.B.

Joe P. Josephson, Josephson & Associates, P.C., Anchorage, for Petitioner.

Blair M. Christensen, Assistant Attorney General, Talis J. Colberg, Attorney General, Anchorage, for Respondent.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and WINFREE, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

William Pastos pled no contest to four counts of violating a protective order by engaging in unlawful contact with his former girlfriend, K.Y. The district court directed him to report to state custody the following morning. Until that time, Pastos was to have no contact, direct or indirect, with K.Y. After he left the courtroom, Pastos went to a bank and deposited a $2,000 check that K.Y. had written him more than three years earlier. Based on Pastos's act of negotiating this check, the district court found that Pastos violated a condition of his release by indirectly contacting K.Y. Pastos served part of his previously suspended sentence and was later released on parole. He appealed the district court's finding of a no-contact violation to the court of appeals, which affirmed. We granted his petition for review. We reverse because the mere act of negotiating a single check, without more, does not constitute "contact" proscribed by a no-contact order.

## II. FACTS AND PROCEEDINGS

William Pastos and K.Y.[1] were in a romantic relationship for approximately two years. In May 2002, near the outset of their relationship, Pastos offered to paint K.Y.'s home.

After the painting was complete, K.Y. wrote a check for $2,000 payable to the order of Pastos.[2] Pastos took the check but declined to negotiate it at that time. He attached it to the visor of his truck where it remained for over three years.

The relationship deteriorated, and K.Y. petitioned for and received a domestic violence protective order in July 2004. The protective order was extended in February 2005. In April 2005 the State charged Pastos with fifty-three violations of the protective order for sending e-mails to one of K.Y.'s e-mail accounts. On August 10, 2005, District Court Judge Sigurd E. Murphy accepted Pastos's plea of no contest to four counts of unlawful contact in the first degree. On each count Pastos was sentenced to 360 days of prison, with 345 days suspended. The sentences were consecutive, giving Pastos sixty days to serve with 1,380 days suspended.[3] Further, there was a ten-year probation period during which time Pastos was to have no contact—direct or indirect—with K.Y. or her mother, K.K. When given the option of entering directly into state custody or reporting the next morning, Pastos elected to report the next morning. The court expressly stated that, pending his incarceration, Pastos was subject to the terms of his bail which included, among other things, no contact—direct or indirect—with K.Y. or her mother, K.K.

During the plea hearing, K.Y. read a lengthy victim impact statement. K.Y. brought up the time Pastos painted her home and asserted that Pastos "wouldn't accept the check." She claimed that the check was still in her possession. This assertion was incorrect.[4] On August 10, the day of his

---

1. We use initials to respect K.Y.'s privacy.

2. It is unclear if this check was part of a painting contract or if the check was a gift from K.Y. to Pastos. The district court suggested that there may have been a painting contract. K.Y.'s testimony supports treating the check as a gift. Pastos's testimony could support treating the check as a gift or contract consideration.

3. The district court stated that Pastos had 1,330 days suspended. This statement appears to have been the result of an arithmetic error.

4. At the probation revocation hearing, K.Y. testified that Pastos returned the check and that it was in her possession in a lockbox in her home. K.Y. concluded that Pastos must have broken into her home to have obtained and later negotiated the check. Pastos and one other witness testified that the check was kept on the visor of his truck. Pastos's ex-wife, via an offer of proof, corroborated this version of events. The district court accepted Pastos's account of the check's history.

sentencing and the day before he was to report to state custody, Pastos negotiated the check, depositing the amount in his bank account. K.Y. learned that Pastos had negotiated the check after receiving notification from her bank that her checking account was overdrawn. The State filed a petition to revoke Pastos's probation,[5] arguing that Pastos's act of negotiating the check constituted prohibited "contact" with K.Y.

In September 2005 Judge Murphy held hearings regarding the State's petition. K.Y. testified that she felt "violated" by Pastos's act. She expressed her belief that Pastos broke into her home and took the check from her lockbox.[6] Pastos stated that K.Y.'s mentioning of the check during her victim impact statement caused him to remember that it was still in his possession. Pastos explained that he negotiated the check due to financial difficulties and that, after consulting with his ex-wife, he decided to cash the check because he "did the work." He testified that he thought K.Y. knew that he possessed the check.

The district court concluded that Pastos's act of negotiating the check violated the no-contact term of his probation.[7] The court found that Pastos

> knew exactly what he was doing by cashing the check, that it wasn't a matter of just wanting the money because he was impoverished, which I assume to be true, but he knew as he left the courtroom and went to cash that check that it would have an effect on [K.Y.], and, therefore, was an indirect contact. This is not an innocent cashing of a check. It is a purposeful action on his part to affect adversely the

victim in this case, and to do so within hours after being warned not to makes the probation violation even more egregious.... Mr. Pastos was aware of a substantial probability that his conduct violated the order and would have the deleterious effect it apparently has had on the victim.

Under AS 11.81.900(a)(2) the court's use of the phrase "aware of a substantial probability" should be read as meaning that Pastos acted "knowingly." The court ordered that Pastos restore the $2,000 to K.Y., plus the five dollar overdraft fee. The court suggested, however, that Pastos could pursue a civil action against K.Y. based on a contract theory that he painted K.Y.'s home in exchange for $2,000. The court also revoked part of Pastos's probation, and sentenced him to 180 days of the previously suspended jail time (forty-five days for each no-contest count).

Pastos appealed the district court's finding of a no-contact violation to the court of appeals. The court of appeals affirmed the district court's finding that Pastos's act of negotiating the check constituted "contact" with K.Y.[8] The court of appeals reasoned that "contact" requires knowing communication, direct or indirect.[9] Given the circumstances of this case, the court of appeals concluded that "Judge Murphy reasonably found that Pastos cashed the check with the knowledge that his action would, in all probability, cause [K.Y.] emotional distress and fear. Because Pastos acted with this culpable mental state, his act of cashing the check constituted prohibited 'contact' with [K.Y.]."[10]

We granted Pastos's petition for review.

---

5. Because Pastos was sentenced before he negotiated the check, the district court concluded that this petition was properly characterized as a petition to revoke probation. For accuracy, the petition probably should have been re-characterized as one for the revocation of a suspended sentence under AS 12.55.110.

6. The district court found that Pastos possessed the check during all relevant times. *See supra* note 4.

7. The court of appeals more accurately characterized Pastos's act as criminal "contact" in violation of a condition of his release under AS

11.56.757(a). This criminal act was the predicate for revoking part of Pastos's suspended sentence. *Pastos v. State*, 157 P.3d 1066, 1067 (Alaska App.2007).

8. *Id.* at 1071.

9. *Id.* at 1070.

10. *Id.* at 1067. Later in the opinion the court emphasized that the issue in this case was a "question of fact" because the context of the case could support a conclusion that Pastos knew that cashing the check would be an act of communication. *Id.* at 1071.

## III. STANDARD OF REVIEW

We review findings of fact for clear error.[11] We review legal questions de novo,[12] "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[13]

## IV. DISCUSSION

Alaska Statute 12.30.040 governs a defendant's release after conviction. This statute, which incorporates pre-trial terms of release from AS 12.30.020,[14] sets forth a variety of conditions of release that a court may employ. As the court of appeals noted, AS 11.56.757 makes it a crime to violate a condition of release. Thus, by finding that Pastos "contacted" K.Y. in violation of a condition of his release, the district court implicitly found that Pastos committed a crime.[15] Under AS 12.55.110 a suspended sentence can be revoked when there is "good cause shown"; a later criminal act is sufficient "good cause" to revoke part or all of a suspended sentence.[16]

To succeed on a petition to revoke probation, the State must show, by a preponderance of the evidence, that the defendant: (1) had notice of the conditions of his probation and (2) violated one of these conditions.[17]

### A. Pastos Did Not "Contact" K.Y. by Negotiating the Check.

The court of appeals correctly noted that "[t]he true source of the problem in this case is the ambiguity of the word 'contact.' "[18] While various criminal statutes use the word "contact," there is no relevant statutory definition of the word.[19] The district court explained to Pastos what "contact" meant.[20] But the district court did not purport to employ a special understanding of the word "contact." Accordingly, we treat the district court's language as explicating our prior definition of "contact."[21]

In *Cooper v. Cooper*, a case considering a domestic violence no-contact order,[22] we adopted a common-meaning definition of "contact." We explained that " '[c]ontacting,' as a verb, means in common usage physically touching or communicating."[23] In cases like this one where there is no physical touching, "nonphysical contact must involve some element of direct or indirect communication and

11. *Cooper v. Cooper*, 144 P.3d 451, 454 (Alaska 2006); *Powell v. State*, 12 P.3d 1187, 1189 (Alaska App.2000).

12. *Cameron v. State*, 171 P.3d 1154, 1156 (Alaska 2007).

13. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

14. AS 12.30.040(a).

15. *Pastos*, 157 P.3d at 1067.

16. *See Wozniak v. State*, 584 P.2d 1147, 1148 (Alaska 1978).

17. *Holton v. State*, 602 P.2d 1228, 1238–39 (Alaska 1979) ("Even though the probationer's liberty is conditional, he still should know what to do to retain that liberty. A probationer who has not violated a condition of probation is entitled to keep his liberty.").

18. *Pastos*, 157 P.3d at 1068.

19. *See id.* at 1068–69 & nn. 1–3.

20. The court provided numerous examples of "contact" that would violate the no-contact order:

Direct or indirect means any contact whatsoever. Whether it is by e-mail, or pager, or telephone, or writing, or even seeing somebody on the street. If there's inadvertent, you know, you're somewhere way far away from where you think she is and you see her in a store and you wave to her or nod to her, that's contact. If you have somebody else contact her for you. We've even had enterprising people in a bar suggest to their friend who was drinking with them, "wouldn't it be nice if X got a call telling her that I'm doing real well now." That's a suggestion and that's a contact. If you have any reason to believe that your suggestion is going to lead to contact through a third party. No contact whatsoever.

21. While the district court provided this explanation before we adopted a common-meaning definition of contact in *Cooper v. Cooper*, 144 P.3d 451 (Alaska 2006), our definition of contact applies to the present case. *See Justice v. RMH Aero Logging, Inc.*, 42 P.3d 549, 554 (Alaska 2002) (newly decided civil cases generally apply to cases still alive at the time of the decision); *Haag v. State*, 117 P.3d 775, 783 (Alaska App. 2005) (same for criminal cases).

22. AS 18.66.100(c)(2).

23. *Cooper*, 144 P.3d at 457–58.

does not merely mean coming within view."[24] Later in the opinion we stated that contacting must be knowing and rejected an argument that contacting must be intentional. Accordingly a person must know "that a particular result will occur even if his objective is not to cause that result."[25]

Non-physical "contacting" thus has two elements: first, some communication must occur, and second, the alleged violator must know of a substantial probability that communication will occur as a result of a given act. We have previously held that communication does not necessarily occur whenever there is an action that has an effect on the protected individual.[26]

The district court recognized that this case presents unusual facts, but stated that, in the context of relationships, communication can take many subtle forms. The court of appeals affirmed.[27] The State echoes the lower courts' reasoning on appeal, arguing that Pastos's act, while an unusual form of non-physical contact, was communicative and thus violated the no-contact order.

We conclude that Pastos's act of cashing the check was not "communication" and thus not "contact" with K.Y. as a matter of law. While the bank's processing of the negotiated check had an effect on K.Y., Pastos's act, occurring via a standardized and impersonal banking transaction, carried little communicative value. Notably, the only information conveyed was from a one-time withdrawal from K.Y.'s account. As such, the negotiated check merely came into view of K.Y. While K.Y. mentioned the check during her victim impact statement, K.Y.'s awareness of the check's existence does not transform Pastos's act of cashing the check into communication directed toward K.Y. Likewise, K.Y.'s mistaken belief that the check was in her possession and that Pastos broke into her home and stole the check does not alter the fact that Pastos merely cashed a check that was in his possession.

This case bears similarities to *Cooper v. Cooper*, where we held that a husband who came into view of his wife did not violate a no-contact order.[28] The husband subject to a no-contact order in *Cooper* attended the Alaska Bar Convention, even though his wife was also at the convention.[29] She asked him to leave, thereby demonstrating that his presence had an effect on her.[30] The husband did leave the convention at his wife's request but later returned.[31] We held that his return to the convention was not "contact" because the husband "merely [came] within view" of the wife.[32] In this case, Pastos's act of negotiating the check at best set off a string of events that eventually came to the attention of K.Y.

Although we hold that the district court was clearly erroneous in finding that Pastos's act of cashing the check was a forbidden contact, negotiating a check might result in a contact with the drafter in other circumstances. For example, information could be conveyed if an endorser wrote a message on the check itself.

### B. Pastos Lacked Notice that His Act Would Be Considered "Contact" with K.Y.

Even if he contacted K.Y., Pastos argues that he did not violate the no-contact order because he lacked notice that his act of negotiating the check would be deemed "contact." While Pastos focuses on his due process rights, we note that notice is a prerequisite element in any attempt to find a violation

---

24. *Id.* at 458.

25. *Id.*

26. *Id.* at 457–58.

27. *See Pastos v. State,* 157 P.3d 1066, 1070–71 (Alaska App.2007) (finding analogous *Broome v. Broome,* 832 So.2d 1247 (Miss.App.2002), which held Ms. Broome committed a contempt of court when she presented, at one time, twenty-nine checks made out to her from Mr. Broome in order to harass Mr. Broome, whose bank dishonored twenty-three of the checks for insufficient funds).

28. 144 P.3d at 453, 457–58.

29. *Id.* at 453.

30. *Id.*

31. *Id.*

32. *Id.* at 457–58.

of a condition of release.[33] Thus, the constitutional requirement of due process is coextensive with the substantive elements of a violation of condition of release. Though we need not address this issue because Pastos did not contact K.Y., we do so to clarify this aspect of no-contact orders.

Pastos's argument that the word "contact" was too indefinite to provide guidance for the unique circumstances of this case has merit. Punishment violates the constitutional requirement of due process when it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." [34] Though we will reject claims of inadequate notice "when the conduct at issue falls squarely within the 'hard core' of conduct that is prohibited," [35] the district court recognized, correctly, that Pastos's case is unusual.

Pastos lacked notice that his act of negotiating the check violated the terms of the district court's no-contact order. The district court perhaps put this best when it told Pastos that he could have asked the court about the check before cashing it. The State seemingly interprets the court's after-the-fact admonition to mean that Pastos, even if he disagreed with the scope of the district court's order, was bound by that order nonetheless. But Pastos has the better view. The order was vague when applied to the facts of this case. While the district court could have clarified the order at a later hearing, the potential for clarification does not cure the vagueness of the order when applied to pre-clarification conduct.

Our decision in *Crutchfield v. State* provides a helpful comparison.[36] Herschel Crutchfield was convicted of operating a motor vehicle while under the influence of drugs based on his use of the prescription drug Tranxene.[37] At the time, Tranxene was not a drug specifically designated under the statute, but the State argued that it was similar to other drugs listed, such as Valium.[38] Relying on a regulation that made illegal the use of drugs similar to the listed drugs, the State obtained Crutchfield's conviction.[39] Crutchfield appealed, arguing that the regulation was unconstitutionally vague because it failed to provide adequate notice of what conduct was prohibited.[40] We agreed with Crutchfield and reversed his conviction, noting that Crutchfield "could not reasonably understand that his contemplated conduct was prohibited." [41]

The State argues that the district court used broad language while explaining the no-contact order to Pastos, but this broad language merely suggests that any definition of "contact" should be read broadly. It did not provide any content to the word "contact" and thus did not provide Pastos with sufficient notice that his act of negotiating the check would be deemed criminal.

## V. CONCLUSION

We REVERSE the decision reached by both the court of appeals and the district court. Pastos did not contact K.Y., and he lacked sufficient notice that his act of negotiating the check would be treated as "contact" with K.Y.

CARPENETI, Justice, not participating.

33. *Holton v. State*, 602 P.2d 1228, 1238–39 (Alaska 1979) (setting forth the standard to revoke probation).

34. *Crutchfield v. State*, 627 P.2d 196, 199 (Alaska 1980) (quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954)). Although the quotation uses the word "statute," this analysis applies to any criminal penalty. Moreover, Pastos's probation was revoked based on a finding that he violated the conditions of release statute, AS 11.56.757(a). *Pastos v. State*, 157 P.3d 1066, 1067 (Alaska App.2007).

35. *Turney v. State*, 936 P.2d 533, 544 (Alaska 1997).

36. 627 P.2d at 196.

37. *Id.* at 197.

38. *Id.* at 197–98.

39. *Id.*

40. *Id.* at 198.

41. *Id.* at 200. We used similar reasoning and reached a similar conclusion in another case involving a drug statute. *See State v. Erickson*, 574 P.2d 1, 20–21 (Alaska 1978).